1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                   EASTERN DISTRICT OF CALIFORNIA

9

10   CONSERVATION CONGRESS,              No.  2:13-cv-01977-JAM-DB

11              Plaintiff,

12        v.                            **ORDER RE PLAINTIFF'S MOTION AND
                                        DEFENDANTS' CROSS MOTION FOR**
13   UNITED STATES FOREST SERVICE,      **SUMMARY JUDGMENT**
     UNITED STATES FISH AND
14   WILDLIFE SERVICE,

15              Defendants,

16        &

17   TRINITY RIVER LUMBER COMPANY,

18              Defendant
                Intervenor.
19

20        And yesterday the bird of night did sit
          Even at noon-day upon the marketplace
21        Hooting and shrieking.

22        - William Shakespeare, Julius Caesar, act 1, sc. 2.

23        This litigation concerns the continuing viability of the

24   revered Northern spotted owl ("NSO") and whether it may soon

25   portend its own demise at the hands of its protector, the federal

26   government.  The United States Forest Service ("USFS") plans to

27   execute the Smokey Project ("Project"), a proposal to administer

28   fuel and vegetative treatments intended to further habitat and

                                       1

1    fire management goals in the Mendocino National Forest ("MNF")

2    and contribute to the MNF's timber production goals.  The USFS

3    engaged with interested parties as it developed the Project,

4    leading to its decision to adopt the proposal.  Conservation

5    Congress ("Plaintiff") participated throughout that process,

6    advocating for the NSO and its old-growth habitat.  It now

7    challenges the USFS's final decisions, as well as the Fish and

8    Wildlife Service's ("FWS"; collectively "Defendants")

9    contributions to the end result.  As described below, the Court

10   agrees that the USFS failed to meet some of its statutory

11   obligations.

                    I.   FACTUAL BACKGROUND

13       The USFS began scoping for the Smokey Project ("Project") in

14   December 2009.  See FS-3643.  Plaintiff submitted its first set

15   of comments the following March and continued communicating with

16   the USFS over the next year.  USFS Administrative Record ("FS")-

17   3627, 3599-3626, FS-3585.  In July 2010, the USFS released the

18   Draft Environmental Assessment and opened the 30-day Objection

19   Period.  FS-1727, 1645.  The Administrative Record indicates that

20   the USFS and Plaintiff had a conference call concerning the

21   project, followed by Plaintiff's submission of its first written

22   Objections in August, which were followed by an in person

23   Objection Resolution meeting.  FS-1636, 1557, 1546.

24       The USFS also consulted with the FWS about the Project's

25   impacts on endangered and threatened species.  From Fall 2009 to

26   early 2011, the agencies conferred over whether or not the

27   Project would adversely affect the NSO.  See Fish and Wildlife

28   Service Administrative Record ("FWS")-1-107; FS-18874-94.  This

1  determination dictates whether a formal—and more extensive—

2  consultation between the agencies is required pursuant to the

3  Endangered Species Act.  See infra Part III.D.  The FWS concluded

4  that the Project "may affect, [and is] likely to adversely

5  affect" the NSO (a "MALAA" determination), FWS-1162-64, while the

6  USFS maintained that a "may affect, not likely to adversely

7  affect" determination—which would not require formal

8  consultation—was appropriate for the Project, FS-18882-86; 50

9  C.F.R. § 402.14.  Due to this disagreement, the agencies elevated

10  the Project to a Level 2 team for review.  FWS-87.  The USFS

11  prepared and submitted a Final Biological Assessment ("BA") for

12  the FWS to review and requested formal consultation on July 5,

13  2011.  FS-18680, 18872; 50 C.F.R. § 402.14(c)(5).  By the time

14  the USFS sent over the BA, the agency had also concluded that an

15  MALAA finding for the NSO was appropriate due to the Project's

16  potential impact on prey species.  FS-18872.

17       While the Project was still under review, field examinations

18  revealed a root disease infection that required Project

19  modification.  FS-18857.  The USFS decided to apply borax to tree

20  stumps in order to prevent the spread of the disease.  FS-3580.

21  The agency reopened scoping for the Project in February 2012 to

22  address three substantive changes to the Project, including the

23  use of borax and the change in the USFS's determination that the

24  Project warranted a MALAA finding.  FS-3580.  Plaintiff submitted

25  its second set of scoping comments at the end of February, which

26  "incorporate[d] by reference [its] original comments as well as

27  [its] original Objection comments (attached)."  FS-3545.

28       The FWS transmitted its Biological Opinion ("BiOp") to the

3

1   USFS on March 15, 2012.  FS-18680.  The BiOp concludes that the

2   Project is not likely to jeopardize the continued existence of

3   the NSO rangewide or within the recovery unit.  FS-18787.  It

4   based this conclusion on the fact that no NSO habitat loss was

5   expected and habitat functionality would be maintained.  FS-

6   18788.  The expected impacts—degradation of some habitat and

7   harassment/mortality in two home ranges—were expected to be short

8   term, returning back to normal within two to three years post-

9   implementation.  FS-18788.  It also concluded that the Project is

10  not likely to result in adverse modification of the NSO critical

11  habitat, and that habitat degradation was not expected to impede

12  the recovery function of critical habitat rangewide or within the

13  province.  FS-18788-89.  An Incidental Take Statement ("ITS")

14  accompanied the BiOp.  The ITS, under "Terms and Conditions,"

15  imposed a Limited Operating Period ("LOP") from February 1st to

16  September 15th in certain units in accordance with recent,

17  protocol-level survey results.  FS-18792.  This LOP supplemented

18  the conservation measures already pleaded in the BA, which the

19  USFS must implement.  FS-18696.  Additionally, the ITS imposes

20  "Monitoring Requirements" that require the agency to document the

21  progress of the action and its effects on the NSO to the FWS in

22  the form of annual monitoring reports containing a minimum of the

23  following information: "progress/status of the proposed project,

24  amount and type of habitat removed or modified, northern spotted

25  owl survey results, and any changes to project implementation not

26  discussed in the biological assessment."  FS-18792-93.

27      The USFS sent out copies of the Draft Final EA and

28  Appendices mid-June 2012 and opened up the second 30-day

4

1   Objection Period.  FS-1365-1436.  Plaintiff submitted additional

2   objections.  FS-1346, 1291.  On August 29th and 30th the USFS

3   published the Final Environmental Assessment and the Decision

4   Notice.  FS-10, 19.  In its final form, the Project will treat

5   approximately 6400 acres and will include fuel treatments through

6   implementation of Strategically Placed Land Area Treatments

7   across the landscape, timber harvest in matrix lands, and

8   improvement of plantations, meadows, hardwood and late

9   successional habitat. FS-21, 23.  The Decision Notice concluded

10  that the Project's actions will not have a significant effect on

11  the quality of the human environment, thus the agency would not

12  be preparing an environmental impact statement.  FS-12.  The

13  Forest Supervisor decided to implement the proposed Project,

14  which incorporates the terms and conditions of the ITS.  FS-11.

15      On December 4, 2012, the FWS published a final, revised rule

16  designating critical habitat for the NSO ("2012 Critical Habitat

17  Rule").  FS-19091.  Because the rule affected most of the

18  Project, USFS issued a Supplemental Biological Assessment.  The

19  Supplemental BA concluded that the new finding with respect to

20  NSO critical habitat is MALAA due to short-term adverse effects

21  to NSO nesting/roosting and foraging habitat.  FS-19089, 19139.

22  The USFS reinitiated consultation with the FWS on that basis.

23  FS-19089.  In the resulting 2014 BiOp, the FWS concluded that the

24  Project is not likely to jeopardize the NSO nor adversely modify

25  or destroy its designated critical habitat. FS-18996.

26      The USFS reinitiated consultation yet again, in January

27  2015, after surveyors discovered NSOs in a new location in the

28  Project area.  FS-19387.  This led to the designation of two new

activity centers.  FS-19348.  The agency sent the FWS its Second
Supplemental BA at the end of May 2015 and the FWS issued its
BiOp, with the same jeopardy and adverse modification
determination, on July 24, 2015.  FS-19243-79.  On November 30,
2015, the USFS published a Supplemental Information Report,
summarizing the agency's "analysis supporting [its] determination
that there is no need for supplemental NEPA analysis arising from
the new circumstances and information related to the Project."
FS-1.

While consultation on the Project was ongoing, the FWS
published the Revised Recovery Plan for the Northern Spotted Owl
("2011 RRP").  FS-4230.  "Recovery plans describe reasonable
actions and criteria that are considered necessary to recover
listed species."  FS-4231.  The 2011 RRP came out June 28, 2011—
one day after USFS biologists signed off on the Project's BA—and
replaced the 2008 version of the plan.  FS-4231.  The 2011 RRP is
frequently referenced in agency documents and is central to some
of Plaintiff's claims.

## II.   PROCEDURAL BACKGROUND

Plaintiff filed its Complaint against the USFS and FWS over
the Project on September 23, 2013, alleging violations of the
National Environmental Policy Act ("NEPA"), the Endangered
Species Act ("ESA"), the National Forest Management Act ("NFMA"),
and the Administrative Procedure Act ("APA").  ECF No. 1.  The
case was twice stayed as the USFS reinitiated consultation with
the FWS at the end of 2013 and again in 2015.  ECF Nos. 15 & 53.
The second stay terminated with the completion of consultation in
July 2015 and Plaintiff filed its Second Amended Complaint, the

1    operative complaint in this case, that October.   ECF Nos. 57 &
2    65.   In February 2015, Trinity River Lumber Company
3    ("Intervenor") moved to intervene as a defendant-intervenor in
4    this case, which the Court allowed after the second stay lifted.
5    ECF Nos. 28 & 63.   Intervenor is a family owned business that
6    purchased the Smokey Stewardship Project in order to harvest the
7    Project trees and process the logs into lumber through its local
8    mill.   See Declaration of Dee Sanders, ECF No. 30.   With the
9    Court's leave, Plaintiff filed a Supplemental Complaint on July
10   26, 2016, based on the Supplemental Information Report that
11   issued after Plaintiff had filed the Second Amended Complaint.
12   ECF Nos. 100, 101, & 102.

13       The parties filed their Motion and Cross-Motions for Summary
14   Judgment in July and September of 2016, respectively.   ECF Nos.
15   103, 106, & 109.   In support of its motion, Plaintiff submitted a
16   Declaration by Tonja Chi, which Defendants moved to strike.   ECF
17   No. 103-4 & 107.   Due to Plaintiff's prior representation that it
18   would not request the Court to consider extra-record declarations
19   in the case, the Court granted Defendants' motion to strike the
20   declaration.   ECF No. 118.   Additionally, the Court granted
21   Defendants' unopposed motion to strike paragraphs 11 and 12 from
22   Denise Boggs' Declaration and paragraph 10 from Ellen Drell's
23   Declaration.   Id.

24       The Court held a hearing on the Motion and Cross-Motions for
25   Summary Judgment on February 2, 2017.   The Court took the matter
26   under submission and ordered further briefing on the question of
27   remedies.   ECF No. 120.

28   ///

1                              III.   OPINION

2          A.   Standard of Review

3          Because Plaintiff's claims arise under Acts that do not

4     provide a separate standard for review, the claims are reviewed

5     under the standards of the APA.   See San Luis & Delta-Mendota

6     Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014).   A

7     court does not employ the usual summary judgment standard in this

8     context because, rather than resolving facts, the court is to

9     determine whether or not "the evidence in the administrative

10    record permitted the agency to make the decision it did."   Ctr.

11    for Sierra Nevada Conservation v. U.S. Forest Service, 832 F.

12    Supp. 2d 1138, 1148 (E.D. Cal. 2011).   Thus, this Court will

13    uphold an agency's decision unless it is arbitrary, capricious,

14    an abuse of discretion, or otherwise not in accordance with law.

15    Jewell, 747 F.3d at 601; 5 U.S.C. § 706(2).   "Although [the

16    Court's] inquiry must be thorough, the standard of review is

17    highly deferential."   Id. (citations and quotation marks

18    omitted).

19         B.   Standing

20         Defendants and Intervenor do not challenge Plaintiff's

21    standing to pursue its claims.   Plaintiff submitted declarations

22    from three of its members, including Executive Director Denise

23    Boggs, in order to establish standing.   Declaration of Denise

24    Boggs ("Boggs Decl."), ECF No. 103-1; Declaration of Douglas

25    Bevington ("Bevington Decl."), ECF No. 103-2; Declaration of

26    Ellen Drell ("Drell Decl."), ECF No. 103-3.   Each declarant

27    states that they visit the relevant area of the Mendocino

28    National Forest for recreational purposes, including looking for

                                      8

1   NSOs.  Boggs Decl. at ¶¶ 4-6, 9; Bevington Decl. at ¶¶ 2, 6, 7;
2   Drell Decl. at ¶¶ 2, 3, 5.  Each declarant has general and
3   specific plans to visit the area in the future.  Boggs Decl. at
4   ¶ 8; Bevington Decl. at ¶ 2; Drell Decl. at ¶ 6.  Each is
5   concerned that the Project will harm the forest and the NSO and
6   relies on Plaintiff to litigate those interests on their behalf.
7   Boggs Decl., *passim*; Bevington Decl. at ¶¶ 5-8; Drell Decl. at
8   ¶ 7-8.  The Court finds these facts sufficient to give Plaintiff
9   standing.  See Conservation Cong. v. U. S. Forest Service, No.
10  2:15-00249, 2016 WL 727272, at *2 (E.D. Cal. Feb. 24, 2016)
11  (finding that Conservation Congress had standing); Cottonwood
12  Envtl. Law Ctr. v. U.S. Forest Service, 789 F.3d 1075, 1079-80
13  (9th Cir. 2015) (describing the standard).

14      C.   NEPA Claims

15      The National Environmental Policy Act is our basic national
16  charter for protection of the environment.  40 C.F.R. § 1500.1.
17  NEPA "has twin aims.  First, it places upon a federal agency the
18  obligation to consider every significant aspect of the
19  environmental impact of a proposed action.  Second, it ensures
20  that the agency will inform the public that it has indeed
21  considered environmental concerns in its decisionmaking process."
22  Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1066 (9th Cir.
23  2002) (internal quotation marks and citations omitted).  NEPA
24  does not impose substantive environmental obligations; "[r]ather,
25  it establishes 'action-forcing' procedures that require agencies
26  to take a 'hard look' at environmental consequences."  Id.

27      Under NEPA, federal agencies must provide a detailed
28  environmental impact statement ("EIS") for every major federal

9

1   action significantly affecting the quality of the human

2   environment.  42 U.S.C. § 4332; 40 C.F.R. § 1508.11.  An agency

3   contemplating such an action may first prepare an environmental

4   assessment ("EA") in order to determine whether an EIS is

5   necessary.  40 C.F.R. § 1508.9; <u>Blue Mountains Biodiversity</u>

6   <u>Project v. Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir. 1998).

7   Should an agency determine that an EIS is unwarranted, it will

8   issue a  Decision Notice and Finding of No Significant Impact

9   ("DN/FONSI") that provides "a convincing statement of reasons" to

10  explain why the action will not have a significant effect on the

11  human environment.  <u>See</u> <u>Save the Yaak Comm. v. Block</u>, 840 F.2d

12  714, 717 (9th Cir. 1988); 40 C.F.R. § 1508.13.

13      The Healthy Forest Restoration Act ("HFRA"), passed in 2003,

14  modifies an agency's NEPA obligations for qualifying projects.

15  The purposes of the HFRA include, *inter alia*, reducing wildfire

16  risks, enhancing efforts to protect watersheds and address

17  threats to forest and rangeland health, and protecting,

18  restoring, and enhancing forest ecosystem components to promote

19  the recovery of threatened and endangered species.  16 U.S.C.

20  § 6501.  An authorized hazardous fuel reduction project may be

21  implemented under the HFRA on federal land if the land contains

22  threatened or endangered species habitat where "natural fire

23  regimes on that land are identified as being important for, or

24  wildfire is identified as a threat to" a threatened species, the

25  project will provide enhanced protection from catastrophic

26  wildfire for the species or its habitat, and the project complies

27  with any applicable guidelines specified in any management or

28  recovery plan for the species.  16 U.S.C. § 6512(a).  Except as

1  provided in the HFRA, authorized projects must still comply with

2  NEPA.  16 U.S.C. § 6514.  An EA or EIS is required for every such

3  project.  16 U.S.C. § 6514.  The HFRA expedites the

4  administrative review process and limits the range of project

5  alternatives that must be considered in detail.  16 U.S.C.

6  §§ 6514(c), 6515; 36 C.F.R. §§ 218.1–218.16.

7      The USFS considers the Project an HFRA authorized hazardous

8  fuels reduction project and Plaintiff does not challenge that

9  designation in this litigation.  The USFS explained that the

10  Project qualifies under the HFRA because the Project is located

11  in a Late Successional Reserve ("LSR") that provides habitat for

12  the NSO, includes portions of NSO critical habitat, and is

13  classified as Fire Regime Condition Class 3, which indicates

14  severe departure from historic conditions and significant chance

15  for the loss of species or habitats.  FS-23.

16      Plaintiff argues that the USFS violated NEPA by: (1) failing

17  to prepare an EIS; (2) failing to adequately assess cumulative

18  impacts; (3) failing to evaluate alternatives; (4) failing to

19  take a hard look at the Project's impacts; and (5) failing to

20  prepare a supplemental EA or EIS.  See Plaintiff's Motion for

21  Summary Judgment ("P. MSJ"), ECF No. 103.  The Court will

22  consider each of these claims in turn, noting that several of

23  Plaintiff's arguments apply to more than one claim.

24          1.   Failure to Prepare an Environmental Impact
                 Statement
25

26      "An EIS must be prepared if 'substantial questions are

27  raised as to whether a project . . . may cause significant

28  degradation of some human environmental factor.'"  Blue Mountains

1   *Biodiversity Project*, 161 F.3d at 1212 (quoting *Idaho Sporting*

2   *Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1996)).  Plaintiff

3   may prevail on its claim that the USFS violated its statutory

4   duty by raising these questions and is not required to show that

5   the significant effects will in fact occur.  *Blue Mountains*

6   *Biodiversity Project*, 161 F.3d at 1212.  An agency "cannot avoid

7   preparing an EIS by making conclusory assertions that an activity

8   will have only an insignificant impact on the environment."

9   *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864

10  (9th Cir. 2004).

11      In order to determine whether an action "significantly"

12  affects the environment an agency must consider the context and

13  intensity of the project.  40 C.F.R. § 1508.27.  Context means

14  "that the significance of an action must be analyzed in several

15  contexts such as society as a whole, the affected region, the

16  affected interests, and the locality."  40 C.F.R. § 1508.27(a).

17  Intensity "refers to the severity of impact" and requires the

18  responsible officials to consider ten separate factors in order

19  to evaluate an action's intensity.  40 C.F.R. § 1058.27(b).  The

20  presence of even just "one of these factors may be sufficient to

21  require an EIS in appropriate circumstances."  *Ocean Advocates*,

22  402 F.3d at 865 (citing *Nat'l Parks & Conservation Ass'n v.*

23  *Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001) *abrogated in part by*

24  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

25      The USFS published its EA and DN/FONSI at the end of August

26  2012.  Plaintiff claims this decision was arbitrary and

27  capricious because the Project implicates six of the ten

28  ///

1    intensity factors.[1]  Thus, Plaintiff argues, an EIS was required.[2]

2             a.    Context

3       The significance of a project "varies with the setting of

4 the proposed action."  40 C.F.R. § 1508.27(a).  Thus, "[c]ontext

5 simply delimits the scope of the agency's action, including the

6 interests affected." Babbitt, 241 F.3d at 731.  "Both short- and

7 long-term effects are relevant."  40 C.F.R. § 1508.27(a).

8       The Smokey Project is located in the Mendocino National

9 Forest in Northern California.  FS-21.  The vast majority (about

10 80%) of the Project will take place in the Buttermilk LSR, with

11 the remainder occurring in matrix lands (12%), riparian reserves,

12 and the Grindstone Inventoried Roadless area.  FS-21-22.

13 Portions of the Project will take place in the NSO's designated

14 critical habitat as determined by the 2012 Critical Habitat Rule.

15 FS-4, 19101-2.  The region's characteristics are discussed in

16

17 [1] These six factors as discussed as follows in Part III.C.1.b-g

18 are: 40 C.F.R. § 1508.27(b)(3) unique characteristics of the
geographic area; (4) the degree to which the effects on the
quality of the human environment are likely to be highly

19 controversial; (5) the degree to which the  possible effects on
the human environment are highly uncertain or involve unique or

20 unknown risks; (7) whether the action is related to other actions
with individually insignificant but cumulatively significant

21 impacts; (9) the degree to which the action may adversely affect
an endangered or threatened species or its habitat that has been

22 determined to be critical; and (10) whether the action threatens

23 a violation of Federal State, or local law or requirements
imposed for the protection of the environment.

24 [2] Plaintiff occasionally cites to findings in the 2014 BiOp.  At
the time the DN/FONSI issued, USFS only had the 2012 BiOp.  The

25 Court will only consider what was in front of the agency at the
time of decision.  See Conservation Cong. v. Heywood, No. 2:11-

26 cv-02250, 2015 WL 5255346, at 8 (E.D. Cal. Sep. 9, 2015) ("Review

27 under the APA is to be based on the full administrative record
that was before the agency at the time it made its decision.")

28 (citations and quotation marks omitted).

1   more detail below.  Plaintiff does not challenge the Project on

2   context grounds.  See P. MSJ at 15.

3               b.   Unique Characteristics of the Geographic
                     Area Such as Proximity to Historic or
4                    Cultural Resources, Park Lands, Prime
                     Farmlands, Wetlands, Wild and Scenic Rivers,
5                    or Ecologically Critical Areas

6        The parties substantially agree that the Buttermilk LSR is a

7   unique and important region of the Mendocino National Forest,

8   especially with respect to late successional habitat dependent

9   species like the NSO.  P. MSJ at 1; FS-42, 211, 5320, 5324.  This

10  consensus is not dispositive: "proximity of a project to a

11  sensitive area does not per se warrant an EIS."  Klamath-Siskiyou

12  Wildlands Ctr. v. Grantham, 424 Fed. Appx. 635, 638 (9th Cir.

13  2011).  Plaintiff must also "explain how the project would have a

14  'significant effect' on [the area]."  Id.  The Court thus

15  considers the region's uniqueness in light of the remaining

16  factors.

17               c.   The Degree to Which the Effects On the
                      Quality of the Human Environment Are Likely
18                    to Be Highly Controversial

19       A project is "controversial" in "cases where a substantial

20  dispute exists as to the size, nature, or effect of the major

21  federal action rather than to the existence of opposition to a

22  use."  Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric., 681

23  F.2d 1172, 1182 (9th Cir. 1982).  The Ninth Circuit has found

24  sufficient controversy where an agency "received numerous

25  responses from conservationists, biologists, and other

26  knowledgeable individuals [-including two California State

27  Departments-] all highly critical of the EA and all disputing the

28  EA's conclusion[.]"  Id.  In contrast, where a dispute is limited

to disagreement between qualified experts over what the data reveals, the Circuit has deferred to the agency.  See Greenpeace Action v. Franklin, 14 F.3d 1324, 1335 (9th Cir. 1992) ("If this type of disagreement were all that was necessary to mandate an EIS, the environmental assessment process would be meaningless.").

Plaintiff contends that there is a substantial dispute as to the effect of the project on the continued existence of the NSO and as to the actual impacts of active management—to this degree—in NSO habitat.  P. MSJ at 23; Plaintiff's Consolidated Reply ("P. Rep."), ECF No. 114, at 24–25.  Plaintiff cites the scientific debate described in the 2011 RRP as evidence of the "ongoing debate" over these issues.  Id.

The USFS addressed this controversy in the EA. FS-42-44. The EA notes several papers that support Plaintiff's position—which Plaintiff raised in comments to the Project—and acknowledges the disagreement in the scientific community.  FS-43.  The EA then explains that the USFS relied on publications and observational data more specific to the relevant area in developing the Project.  Id.  The EA also explains that the Project does not conflict with findings that burned forests may benefit the species because the Project aims to manage stands to reduce the risk of mortality rather than eliminate fire occurrence entirely.  Id.

As Plaintiff points out, the RRP also acknowledges the disagreement in the scientific community on these issues. See FS-4287.  The RRP discusses publications similar to those Plaintiff raised in its comments to the Project.  It addresses the issue as

15

1 follows:

2         This debate focuses on uncertainty and seems to be one
          of degree rather than fundamental difference in long-
3         term conservation goals.  We would like to build on
          areas of agreement for spotted owl recovery, but we
4         recognize that many of these recommendations are
          controversial due to political and socio-economic
5         reasons.  However, given the need for action in the
          face of uncertainty, we continue to recommend that land
6         managers implement a program of landscape-scale,
          science-based adaptive restoration treatments in
7         disturbance-prone forests[.]

8 FS-4287.  In another section, the RRP recognizes that its

9 recommendation to apply "active forest management" "may be

10 controversial" due, in part, to the different risks, benefits,

11 and predictability of treatment in different areas.  FS-4277.

12     This evidence of some disagreement in the scientific

13 community does not make this particular Project "highly

14 controversial."  The USFS explained why its conclusions differ

15 from Plaintiff's position and the cited publications.  Its

16 explanation accords with the RRP's observation that the benefit

17 of forest management will vary by forest area.  See FS-4277.  The

18 USFS considered opposing viewpoints and chose to rely on the

19 conclusions of its own experts; those conclusions are tailored to

20 this specific Project.  This cited disagreement does not trigger

21 the "highly controversial" factor.

22     Plaintiff also argues that the disagreement between the USFS

23 and FWS employees over the MALAA determination, documented in

24 inter-agency and intra-agency emails, constitutes controversy.

25 The Court does not agree that this early disagreement mandates an

26 EIS.  Plaintiff's argument centers on emails from 2010 and 2011

27 and concerns a dispute as to whether a formal FWS consultation

28 was necessary.  See generally FWS-1-1161; P. MSJ at 23; P. Rep.

16

1   at 7-11.  Despite that disagreement, the USFS moved forward with

2   formal consultation and later agreed that with the FWS's

3   determination.  FWS-1111-14, 1285.  Plaintiff does not point the

4   Court to any evidence in the decision documents that indicates

5   the agencies continued to feud over the Project's impacts.  In

6   fact, the USFS addressed the initial disagreement in the EA:

7
            The context of determining the threshold of 'may
            affect, likely to adversely affect' is an individual
8           animal; the intensity threshold is very low, such that
            effects as minor as changes in foraging patterns and
9           with probabilities as low as 'not discountable' receive
            a MALAA call. It is not highly controversial to differ
10          on such fine points.

11  FS-44.  The agency also stated, several times, that it ultimately

12  defers to the FWS on the determination.  FS-44, FS-53.  The early

13  emails alone do not indicate that the Project in its final form

14  is "highly controversial."  <u>See</u> <u>Friends of the Earth v. Hintz</u>,

15  800 F.2d 822, 834 (9th Cir. 1986) (finding that early comments

16  indicating a contrary position did not render the final decision

17  arbitrary and capricious) ("Certainly, the Corps' initial

18  comments were preliminary and subject to change as understanding

19  of permit issues expanded, the factual record developed, and the

20  mitigation plan created.").

21                      d.   <u>The Degree to Which the Possible Effects On</u>
                             <u>the Human Environment Are Highly Uncertain</u>
22                           <u>or Involve Unique or Unknown Risks</u>

23       "[T]he regulations do not anticipate the need for an EIS

24  anytime there is some uncertainty, but only if the effects of the

25  project are 'highly' uncertain."  <u>Envtl. Prot. Info. Ctr. v. U.S.</u>

26  <u>Forest Service</u>, 451 F.3d 1005, 1011 (9th Cir. 2006) ("EPIC").

27  The use of the word "highly" means that information merely

28  favorable to a plaintiff does not necessarily reach the

                                   17

1    significance threshold.  Native Ecosystems Council v. U.S. Forest

2    Service, 428 F.3d 1233, 1240 (9th Cir. 2005).  "Preparation of an

3    EIS is mandated where uncertainty may be resolved by further

4    collection of data, or where the collection of such data may

5    prevent 'speculation on potential . . . effects.'"  Id. (quoting

6    Babbitt, 241 F.3d at 731–32).

7         Plaintiff directs the Court to FWS's acknowledgment—in its

8    email communications and the 2011 RRP—"that there are significant

9    scientific uncertainties both as to the impacts of wildfire on

10   NSOs and as to the risks of forest treatments intended to reduce

11   wildfire risk."  P. MSJ at 23; P. Rep. at 22.  As discussed in

12   the previous section, the 2011 RRP acknowledges that the expert

13   disagreement regarding the impact of wildfire and active forest

14   management on NSOs centers on uncertainty.  FS-4287 ("This debate

15   focuses on uncertainty and seems to be one of degree rather than

16   fundamental difference in long-term conservation goals.").  The

17   RRP also discusses the uncertainties associated with barred owls,

18   FS-4252, climate change, FS-4265, decision-making in light of

19   past management activities, Id., and the short- and long-term

20   effects of ecosystem restoration, FS-4280.  Additionally,

21   Plaintiff argues, the RRP emphasizes an "adaptive management"

22   approach to management decisions due to such uncertainties.  P.

23   Rep. at 23 (citing FS-4237, 4260, 4261, 4306).

24        Although these documents do indicate uncertainty with

25   respect to NSO recovery efforts, Plaintiff does not tailor its

26   argument to the context of the Project at issue.  To an extent,

27   the Court may infer from these generalities that aspects of the

28   Project cross into uncertain territory.  But the Court cannot

1    conclude, without more, the degree that this Project's possible

2    effects on the human environment are highly uncertain.  Plaintiff

3    has not argued that the Project's forest management techniques

4    are new, unique to the region, or experimental such that the

5    results are unpredictable.  Cf. Ore. Wild v. Bureau of Land

6    Mgmt., No. 6:14-cv-0110, 2015 WL 1190131 (D. Ore. Mar. 14, 2015)

7    (finding the effects of a pilot project to be "highly

8    uncertain").

9         Plaintiff further points out that there is a self-inflicted

10   dearth of information with respect to the effects of projects

11   like this in the Mendocino National Forest.  P. Rep. at 23-24; P.

12   Rep. at 4, n.1; see supra "Factual Background" (describing

13   "Monitoring Requirements").  The record reveals that the USFS had

14   failed to satisfy its monitoring obligations for other projects

15   prior to its approval of this one.  Plaintiff raised the USFS's

16   failure to monitor its past projects in its initial comments:

17   "[W]e have significant objections to this type of vegetation

18   management in LSR when the Mendocino NF has violated its

19   monitoring reporting requirements to the FWS for NSO for the life

20   of the LRMP [(Land and Resource Management Plan)]."  FS-174.  The

21   USFS's response, attached to the final EA in Appendix Z: "The

22   forest has not done the monitoring."  Id.  Plaintiff renewed its

23   concern during the Objection Period:

24        Through a FOIA request the Conservation Congress has
          documented that the NMF [sic] has never submitted a
25        monitoring report to the USFWS that is required under
          Enforceable Terms and Conditions found in Biological
26        Opinions.  By not submitting these mandatory reports
          during the life of the LRMP, 15 years, the MNF has
27        allowed the Environmental Baseline for the NSO to
          become invalid.  The MNF has not documented the amount
28        of owl habitat that has been removed, degraded, or

                                    19

downgraded not [sic] has it kept up to date its
incidental take database.  The Forest has also failed
to ever conduct any emergency consultations with the
USFWS after wildfires affected CHU/LSR.

FS-1561.  The Reviewing Official responded: "The [MNF]

acknowledges that the cited requirements have not been met, and

is in the process of compiling information to satisfy monitoring

requirements of past Biological Opinions for reporting to USDI-

FWS and NOAA Fisheries."  FS-1539.  That response issued

September 15, 2010.  The EA does not address the lack of

monitoring in its uncertainty analysis.

    Although the Court is concerned by these admissions, it

lacks the context it would need to evaluate the degree to which

the deficiency makes the Project's impacts "highly uncertain."

The Court cannot readily determine how this data would change the

analysis supporting the Project.  Despite the lack of monitoring,

the BiOp contains over eighty pages of NSO related analysis,

including the Status of the NSO, Environmental Baseline, Effects

of the Proposed Action, Cumulative Effects, and Critical Habitat.

FS-18699-787.  Both the BA and the BiOp reference NSO numbers,

distribution, and survey data.  FS-214-215, 18730-33, 18741-42.

Without more, the Court cannot find that the USFS's conclusion on

this factor was arbitrary.

        e.   Whether the Action is Related to Other
             Actions With Individually Insignificant But
             Cumulatively Significant Impacts

    "Significance exists if it is reasonable to anticipate a

cumulatively significant impact on the environment.  Significance

cannot be avoided by terming an action temporary or by breaking

it down into small component parts."  40 C.F.R. § 1508.27(b)(9).

1  "The general rule under NEPA is that, in assessing cumulative

2  effects, the agency must give a sufficiently detailed catalogue

3  of past, present, and future projects, and provide adequate

4  analysis about how these projects, and the differences between

5  the projects, are thought to have impacted the environment."

6  Cascadia Wildlands v. Bureau of Indian Affairs, 801 F.3d 1105,

7  1111 (9th Cir. 2015).  "Consideration of cumulative impacts

8  requires some quantified or detailed information that results in

9  a useful analysis, even when the agency is preparing an EA and

10  not an EIS."  Ctr. for Envtl. Law & Policy v. U.S. Bureau of

11  Reclamation, 655 F.3d 1000, 1007 (9th Cir. 2011) (internal

12  quotation marks and citations omitted).  NEPA does not mandate

13  that the effects be presented in a particular form; an agency has

14  discretion in deciding how to organize and present information.

15  See Mont. Wilderness Ass'n v. Connell, 725 F.3d 988, 1002 (9th

16  Cir. 2013).

17      Plaintiff first challenges the scope of the EA's cumulative

18  impacts analysis, arguing that the USFS "irrationally limited

19  [the analysis to] the perimeter of the immediate project area and

20  fail[ed] to account for the impacts of the Project together with

21  other actions affecting the NSO in the critical Buttermilk LSR."

22  P. MSJ at 21-22.  It argues that because the USFS has recognized

23  the critical importance of the Buttermilk LSR, it should have

24  analyzed the cumulative effects of the Project at that scale.  P.

25  MSJ at 22.

26      Courts generally "defer to an agency's determination of the

27  scope of its cumulative effects review" and deference is

28  warranted in this case.  See Neighbors of Cuddy Mountain v.

1  Alexander, 303 F.3d 1059, 1071 (9th Cir. 2002) (upholding Forest

2  Service's cumulative effects analysis that only considered the

3  west side of the forest rather than the entire forest); see also

4  Kleppe v. Sierra Club, 427 U.S. 390 (1976) ("[D]etermination of

5  the extent and effect of [cumulative environmental impacts], and

6  particularly identification of the geographic area within which

7  they may occur, is a task assigned to the special competency of

8  the appropriate agencies.").  The BA—the document cited in the EA

9  for the NSO cumulative effects analysis—analyzes the

10  environmental baseline and cumulative effects at the scale of the

11  "Action Area."  This area includes "the proposed treatment units

12  plus a 1.3 mile radius surrounding the unit boundaries."  FS-188.

13  The BA explains that this acreage is used to account for those

14  species that are wide ranging, like the NSO.  Id.  The Action

15  Area encompasses 35,023 acres while the area of the proposed

16  treatment units amounts to 6,337.  Id.  This delimited area

17  appears to account for the location and movement patterns of the

18  NSOs, thus warranting the Court's deference on this issue.

19       Plaintiff further argues that the NSO analysis is inadequate

20  because "private actions are nowhere considered in the EA or any

21  other environmental documentation for the project."  P. MSJ at

22  22.  Actually, private actions are briefly discussed in the

23  "Summary of Cumulative Effects" section of the BA, which the EA

24  references.  FS-267; see also FS-45) ("Both private land and

25  Forest Service are accounted for in this analysis.").  The BA

26  identifies overlapping parcels of private land and states their

27  apparent use, including some "light to moderate selective

28  harvesting."  Id.  As for smaller personal inholdings, it states

1    that future management is unknown though "it can be predicted

2    that some may be harvested, used for recreation, developed, or

3    burned through prescribed fire." Id.  A few lines down the BA

4    concludes: "Considering potential Federal and other management

5    activities, the home ranges would continue to provide adequate

6    habitat for reproducing pairs.  Suitable habitat on private land

7    was not considered as part of this analysis.  Loss of habitat on

8    private land would not affect the suitability of these home

9    ranges." Id.  This final sentence indicates that even if private

10   landholders harvested their land, the NSO home ranges would

11   remain intact.  Plaintiff does not identify any particular

12   private projects that the USFS should have accounted for and the

13   Court cannot speculate that any such "reasonably foreseeable"

14   actions were omitted.

15       Lastly, Plaintiff contends that the cumulative effects

16   analysis is inadequate with respect to past projects.  P. MSJ at

17   22; P. Rep. at 22 (conceding that the USFS did provide a more

18   nuanced discussion of concurrent and future projects).  The Court

19   finds that the USFS adequately addressed past actions.  Under

20   Ninth Circuit precedent, an agency "may satisfy NEPA by

21   aggregating the cumulative effects of past projects into an

22   environmental baseline, against which the incremental impact of a

23   proposed project is measured." Cascadia Wildlands, 801 F.3d at

24   1111.  The BA first addresses past actions in the subsection on

25   "Baseline Information." See FS-204-228.  With respect to forest

26   management, the BA provides a table of past timber sales with the

27   year and the number of acres sold. FS-205.  It then measures the

28   footprint of what was harvested (4,468, 13% of the Action Area)

23

1    and identifies the subset of that footprint that remains in a

2    plantation type condition (1,500 acres, 4% of the Action Area).

3    Id.  It concludes that about half of those remaining acres

4    currently provide foraging quality habitat.   Id.  Several pages

5    later, the BA turns to the NSO and discusses its present status

6    and environmental baseline.  FS-214-15.  The BA is only one of

7    multiple reports cited in the EA, each of which assess the

8    cumulative effects of the project with respect to particular

9    resources.   See, e.g., Fuels Report, FS-539-56 (discussing

10   "Existing Conditions" and "Actions (past, present, future)

11   significant to cumulative effects").  Plaintiff has not

12   identified any past projects or events that USFS failed to

13   account for; thus, the Court has no reason not to defer to the

14   agency on this issue as well.

15                    f.   The Degree to Which the Action May Adversely
                           Affect An Endangered or Threatened Species or
16                         Its Habitat That Has Been Determined To Be
                           Critical Under the Endangered Species Act of
17                         1973

18        "NEPA regulations direct the agency to consider the degree

19   of adverse effect on a species [or critical habitat], not the

20   impact on individuals of that species."  EPIC, 451 F.3d at 1010.

21   It is therefore not the case that any impact to a listed species

22   requires an EIS.  See id. at 1012.  The USFS evaluates this

23   significance factor based on "the capability of the affected area

24   to support overall viability of affected endangered or threatened

25   species."  FS-50 (citing Wildlife Specialist Report, July 16,

26   2010, and Methodology for MIS Analysis, 2009).

27   ///

28   ///

                                  24

1   As described in the "Factual Background," above, the EA

2   concludes that the Project's impacts to the NSO are not

3   significant.  FS-53.  The EA cites each agency's conclusion that

4   although there is potential for harm to individual NSOs, that

5   potential is short term.  Id.  It cites the BiOp's conclusion

6   that the Project will not jeopardize the continued existence of

7   the species at either the range-wide or the recovery unit scale,

8   as well as the favorable conclusions in the BA and Wildlife

9   Specialist Report.  Id.  The USFS determined: "Based on the small

10   number of owls impacted, the short-term nature of the impacts,

11   the undiminished functionality of all affected suitable habitat,

12   and the continued ability of the area to support viability, the

13   impacts to NSO are not significant."  Id.

14   Plaintiff argues that the USFS's conclusion is untenable

15   given the MALAA determination and FWS's findings throughout the

16   record that the project would significantly impact NSOs.  P. MSJ

17   at 16–17.  Plaintiff points out that the BiOp uses the term

18   "significant" in multiple places.  See, e.g., FS-18757

19   ("Commercial thinning, fuels treatments, and habitat enhancement

20   treatments are expected to result in significant effects to [NSO]

21   breeding, feeding, and/or sheltering . . . .), 18766 ("Smoke

22   disturbance and habitat manipulation are expected to cause

23   significant impairment of breeding, feeding, and sheltering of

24   [NSOs] at this activity center during years 3, 4, and 5").

25   Defendants argue that significance is a term of art in the NEPA

26   context and it is the USFS's determination, not the FWS's use of

27   the term, that dictates whether an EIS is required.  Federal

28   Defendants Cross-Motion for Summary Judgment ("D. Cr. Mot.") at

1 | 17.

2      Although the Project will have some impact on the NSOs in

3 the Project area, the Court defers to the USFS's finding that the

4 impact is not significant.  The Court finds the Ninth Circuit's

5 analysis in EPIC instructive.  In that case, the plaintiff argued

6 that an EIS should have been prepared because the project at

7 issue was "likely to affect the NSO and its critical habitat

8 significantly."  EPIC, 451 F.3d at 1010.  The FWS's BiOp reported

9 that "'three nest sites could be destroyed' and that the logging

10 [would] remove 'most, if not all, of the small amount of existing

11 nesting habitat' within the critical habitat units."  Id.  Of the

12 578 acres to be logged in the Klamath National Forest, 125 acres

13 had been designated critical habitat.  Id.  Fourteen acres of

14 nesting habitat was set to be removed, fifty-one acres of high

15 quality nesting habitat would be degraded to moderate quality,

16 and the remaining sixty acres—only suitable for dispersal—would

17 maintain its dispersal function post- harvest.  Id.  Despite

18 these certain and potential losses, the EPIC court deferred to

19 the agency.  It reasoned as follows:

20 |     These statements, however, must be read in context. For
       example, although the logging will remove existing
21     nesting habitat from two critical habitat units, this
       amounts to a total of only fourteen acres.  Similarly,
22     the Project does not authorize the destruction of any
       existing nest sites, and surveys and seasonal
23     restrictions operate to protect potentially occupied
       nest sites.  The projected take of three nests or pairs
24     of owls is based on extrapolations from nesting data,
       and FWS determined that this level of anticipated take
25     was permissible under the ESA.

26 EPIC, 451 F.3d at 1010.  In conclusion, the Ninth Circuit held

27 "[i]t was not arbitrary and capricious for USFS to determine that

28 although there will be some effect on individual pairs, this will

1   not cause a significant adverse effect on the species and require

2   an EIS." Id. at 1011.

3       Although the project in EPIC was much smaller than the

4   Project in this case, the proposals have similar projected

5   impacts.  This Project is expected to degrade habitat in two

6   activity centers, resulting in significant effects for the owls

7   in those centers; "take in the form of harm of juvenile [NSOs]

8   and harassment of adult [NSOs]" is expected.  FS-18789-90.

9   Implementation of the LOP is expected to decrease the risk of

10  harm to young in one of those centers.  FS-18792.  No loss of NSO

11  habitat is expected and habitat function of the treated areas

12  will be maintained (minus one linear unit for a temporary road).

13  FS-18788.  Habitat degradation is expected to be short-term,

14  returning to normal after two to three years.  FS-52, 18788.

15  Unlike the EPIC project, no NSO habitat will be removed and no

16  destruction of nest sites is anticipated.  Thus, following the

17  EPIC court's directive that significant effects to individual

18  owls does not necessarily imply significant effects to the

19  species, this Court finds that the USFS's "effects" conclusion

20  was not arbitrary and capricious.

21      Plaintiff's additional arguments on this question are

22  unavailing.  Plaintiff argues that the USFS improperly relied on

23  the FWS's "no jeopardy" determination in order to justify its

24  conclusion regarding significance.  P. MSJ at 19.  This

25  characterization of the agency's determination is inaccurate; the

26  USFS refers to the Biological Assessment, Biological Opinion, and

27  Wildlife Specialist Report Plaintiff in support of its

28  determination.  FS-53.  It is entirely proper for the USFS to

consider the FWS's findings, along with the findings in these other documents, in reaching its conclusion.  <u>See</u> <u>EPIC</u>, 451 F.3d at 1012 ("Clearly, NEPA and the ESA involve different standards, but this does not require the USFS to disregard the findings made by FWS in connection with formal consultation mandated by the ESA.").  Finally, Plaintiff argues that the FWS's findings should not inform the USFS's conclusion because those findings relate to the range-wide and recovery unit scale impacts, rather than the Buttermilk LSR.  P. MSJ at 19.  As already discussed, NEPA requires the USFS to consider the degree of adverse effect on a species, not individuals.  <u>EPIC</u>, 451 F.3d at 1010.  Plaintiff fails to explain how a range-wide or recovery unit-scale analysis would impede the USFS in fulfilling its obligation.

g.   <u>Whether the Action Threatens a Violation of Federal, State, or Local Law or Requirements Imposed For the Protection of the Environment</u>

Plaintiff claims that because the Project violates the NFMA, the USFS is required to prepare an EIS.  Plaintiff argues that the DN/FONSI's claim that the project is consistent with the Mendocino National Forest Land and Resource Management Plan ("LRMP" or "Forest Plan") is contrary to FWS's express finding that the Project is inconsistent with portions of Recovery Action 10 of the RRP.  P. MSJ at 20 (citing FS-18983).  The Court will fully address Plaintiff's claims with respect to the National Forest Management Act and 2011 Revised Recovery Plan in Part III.E, below.  The Court concludes that the Project does not violate the NFMA.

///

///

1
            h.    Conclusion

2       None of the issues Plaintiff raises—either separately or

3   taken together—mandates preparation of an EIS.   The Court finds

4   for the Defendants on this claim.

5           2.    Failure to Analyze Cumulative Impacts

6       Plaintiff asserts the failure to evaluate cumulative impacts

7   of the proposed action as a separate NEPA cause of action.

8   Compl. at 26.   In its briefs, Plaintiff's only arguments with

9   respect to cumulative effects are contained under the cumulative

10  effects intensity factor, addressed at Part III.C.1.e, supra.

11  See P. MSJ at 20.   As the Court concluded above, the USFS

12  addressed the cumulative effects in the EA and the underlying

13  reports.   The Court rules in favor of the Defendants on this

14  claim.

15          3.    Failure to Develop Alternatives

16      Plaintiff argues that the USFS's alternatives analysis was

17  inadequate because the Project's stated purpose is arbitrary and

18  because the USFS failed to consider a proposed, reasonable

19  alternative.   The Court agrees that the alternatives analysis is

20  inadequate.

21          a.    Purpose and Need of the Project

22      The purpose and need of a project defines the scope of the

23  alternatives analysis and an agency need only evaluate

24  alternatives that are reasonably related to the project's

25  purposes.   League of Wilderness Defenders-Blue Mountains

26  Biodiversity Project v. U.S. Forest Service, 689 F.3d 1060, 1069

27  (9th Cir. 2012).   Courts afford agencies "considerable discretion

28  to define the purpose and need of a project."   Id. (citations and

1    quotation marks omitted).  However, because "the stated goal of a

2    project necessarily dictates the range of reasonable alternatives

3    [,] [] an agency cannot define its objectives in unreasonably

4    narrow terms."  City of Carmel-By-The-Sea v. U.S. Dep't of

5    Transp., 123 F.3d 1142, 1155 (9th Cir. 1997).

6         The Project's purpose and need, as articulated in the EA, is

7    the following:

8         The purpose of [the Project] is primarily to contribute
          to achieving wildlife habitat, fire management and
9         secondarily to timber production goals established by
          the MHF Forest Plan.  There is also a need to comply
10        with applicable management direction of the Forest
          Plan, Forest Service Policy regulations and laws.  Thus
11        the proposal includes design features and requirements
          to ensure environmental compliance in addition to the
12        activities that would achieve the Forest Plan goals.

13   FS-23.  Plaintiff contends that this purpose is arbitrary because

14   it conflicts with the 2011 RRP.  P. MSJ at 12.  Plaintiff argues

15   that this purpose "ineluctably led the USFS to consider only a

16   single irrational action alternative for the Project."  Id.

17        The Project's purpose does not conflict with the RRP as

18   Plaintiff claims.  The RRP repeatedly states that it support

19   forest management practices that aim to restore more natural

20   vegetation patterns and fire regimes, including management in

21   certain areas to reduce fire severity.  See, e.g., FS-4298-99.

22   The above quoted purpose does not contradict this advice.  The

23   term "fire management" is broad and may be understood to

24   encompass the type of management the RRP favors.  Furthermore,

25   Plaintiff's own proposed alternatives, described below, belie the

26   fact that the Project's purpose was not so narrowly drawn as to

27   preclude consideration of other alternatives.

28   ///

                                   30

b.   Alternatives Analysis

Alternatives analysis is the heart of the environmental impact statement.  40 C.F.R. § 1502.14.  The analysis "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  Id.

Under NEPA, "[a]gencies are required to consider alternatives in both EISs and EAs and must give full and meaningful consideration to all reasonable alternatives."  Te-Moak Tribe of West. Shoshone of Nev. v. U.S. Dep't of Interior, 608 F.3d 592, 601–02 (9th Cir. 2010).  "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate."  Morongo Band of Mission Indians v. F.A.A., 161 F.3d 569, 575 (9th Cir. 1998) (internal quotation marks and citation omitted) (applying this rule in the EA context).  Projects authorized under the HFRA—like this one—need only consider three alternatives: the proposed agency action; the alternative of no action; and an additional action alternative, if the additional alternative—(i) is proposed during scoping or the collaborative process under subsection (f); and (ii) meets the purpose and need of the project, in accordance with regulations promulgated by the Council on Environmental Quality. 16 U.S.C. § 6514(c).

The parties agree that under the HFRA, the USFS is required to consider one additional action alternative provided that the above conditions are met.  The parties dispute whether those conditions were met in this instance.  Plaintiff argues that it

1    proposed a viable action alternative that the USFS failed to

2    consider.  P. MSJ at 13; P. Rep. at 16.  Specifically, Plaintiff

3    contends that the following sentence, from its First Objection,

4    raised an alternative that should have been considered: "To meet

5    the intent of the LRMP, prescriptions should be designed to only

6    maximize volume over other resources in the suitable timber base,

7    not LSR.  This is despite the reality that more limited thinning

8    from below prescriptions with quantitative diameter limits (e.g.

9    no big trees over 18" DBH will be cut in LSR) were a viable

10   option that would meet all HFRA objectives, while also being

11   consistent with LSR duties."  FS-1580.  The USFS did not consider

12   an 18" DBH diameter cap.

13        Intervenor asserts that the USFS did not need to consider

14   Plaintiff's diameter cap recommendation because the alternative

15   was not raised during the first scoping period.  Defendant-

16   Intervenor's Cross-Motion for Summary Judgment ("I. Cr. Mot."),

17   ECF No. 109, at 9–10; Defendant-Intervenor's Reply ("I. Rep."),

18   ECF No. 115, at 7.  This argument is not persuasive.  The HFRA

19   requires an agency to consider an action alternative raised

20   during scoping or the collaborative process under subsection (f).

21   16 U.S.C. § 6514(c)(1)(C)(i).  Subsection (f) prescribes "Public

22   Collaboration" consistent with the "Implementation Plan," that

23   encourages meaningful public participation during preparation of

24   authorized hazardous fuel reduction projects.  16 U.S.C.

25   § 6514(f).  What constitutes the "collaborative process" is not

26   clear; it does not appear that another court has had an

27   opportunity to delimit the phrase.  However, under basic

28   principles of statutory interpretation, the Court may infer that

the "collaborative process" means something beyond "scoping" or the addition would be superfluous.  See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").  Based on the Plaintiff's active participation throughout the iterations of the Project—as described in the "Factual Background"—the Court concludes that Plaintiff's suggestions were made during the collaborative process.

Defendants focus their argument on Plaintiff's form rather than timing.  They argue that Plaintiff did not suggest an 18" DBH cap "outright" but merely did so "in passing" such that it failed to actually suggest an alternative that the USFS was required to consider.  D. Cr. Mot. at 15-16; Federal Defendant's Reply ("D. Rep."), ECF No. 117, at 4.

This argument is also unpersuasive.  The USFS nominally considered a diameter cap alternative in the EA.  Under "Alternatives not Considered in Detail," the USFS lists "Using a diameter limit, removing no trees over 10" DBH" as an "alternative [] suggested by comments received during both scoping comment periods."  FS-36-37.  It then states that this cap would not meet the purpose and need of the project.  Id. Plaintiff calls this "10" diameter cap" a "strawman alternative." P. MSJ at 13.  After comparing the "Alternatives Analysis" in the EA to the comments and objections in the Administrative Record, the Court agrees.  This Court's review of Appendix Z (Scoping Summary and Issue Identification), Supplemental Appendix Z

33

1   (Smokey EA Supplement, Scoping Summary and Issue Identification),

2   and the scoping documents included in the Administrative Record

3   (FS-3240-3691) does not turn up any comments specifically

4   suggesting a 10" diameter cap.[3]   In contrast, there were multiple

5   comments and objections suggesting a diameter cap for large trees

6   and/or expressing concern over the cutting of larger trees.   See,

7   e.g.:

8       • FS-3629 ("The HFRA also has very strong direction

9           regarding the maintenance of old growth and 'Large'

10          diameter trees." – Conservation Congress ("CC"), 1st

11          Scoping);

12      • FS-3629 ("There is not information regarding size

13          classes or age class for either management area [(LSR

14          or Matrix)] and this information needs to be

15          disclosed." – CC, 1st Scoping);

16      • FS-3636 ("These concerns would be greatly reduced if

17          you would adopt a maximum DBH size such as 24" for the

18          trees that can be cut, especially in the LSR." –

19          California Wilderness Center, 1st Scoping);

20      • FWS-61 ("Also is there a radius around the hardwoods

21          that would be followed?  Would it include removal of

22          larger trees (24"+ dbh)?" – FWS, 1st Scoping);

23      • FWS-1162 ("There may be areas where 20-24" trees could

24          be harvested without adverse effects, but those would

25          be on a site specific basis depending on stand

26  _____

27  [3] At the hearing, Defense counsel raised the possibility that
    this suggestion was made at a meeting between Conservation
    Congress and USFS representatives, but conceded that it was not
28  documented in the record.

1          characteristics." – FWS, Rationale for [MALAA]

2          Determination);[4]

3      • FS-1568 ("The HFRA was passed with significant duties

4          to not cut larger diameter, big, or old growth trees

5          whenever feasible. Meeting that duty was feasible in

6          the Smokey Project area. However the Smokey proposed

7          action was designed to include logging various big,

8          large diameter, and old growth trees and forests in a

9          manner that violates the new legislative standard." –

10         CC, 1st Objection);

11     • FS-1569 ("The removal of large diameter trees is not

12         necessary in order to attain the objectives of this

13         HFRA project.  Furthermore, the controversy over large

14         trees has been expressed continually from multiple

15         organizations and local residents throughout the past

16         nearly two years of meetings and comments." – CC, 1st

17         Objection);

18     • FS-1580 ("To meet the intent of the LRMP, prescriptions

19         should be designed to only maximize volume over other

20         resources in the suitable timber base, not LSR.  This

21         is despite the reality that more limited thinning from

22         below prescriptions with quantitative diameter limits

23         (e.g. no big trees over 18" DBH will be cut in LSR)

24         were a viable option that would meet all HFRA

25         objectives, while also being consistent with LSR

26

27  [4] The Court agrees with Defendants that the FWS did not propose a
    20" diameter cap as Plaintiff suggests.  The quoted statement
28  does, however, add weight to Plaintiff's point more generally.

1    duties." – CC, 1st Objection);

2    • FS-3546 ("Yet a secondary purpose of the project is to

3    achieve timber production goals established in the

4    Forest Plan. It's clear the secondary purpose is

5    actually the first, since almost 18% of the timber cut

6    will be 24" DBH or greater." – CC, 2nd Scoping);

7    • FS-3547 ("The Supplemental BA information included a

8    Cruise Data Sheet documenting the DBH of trees to be

9    cut.  According to this chart, 36.2% of the trees

10   logged in Smokey will be 20" DBH or GREATER – up to 43"

11   DBH.  These trees in critical habitat should not be

12   logged for any reason[.]" – CC, 2nd Scoping);

13   • FS-3547 ("We also note from out FOIA responsive records

14   that the FWS requested diameter limits repeatedly for

15   this project yet their requests were also ignored by

16   the NMF . . . . [In phone calls, the DOI/FWS has]

17   stated that trees over 24" DBH should not be logged in

18   owl critical habitat. . . . The FS has never

19   articulated a rationale for not providing diameter

20   limits for timber projects in owl habitat despite

21   repeated requests to do so.  We surmise it is because

22   it is proposing to log large diameter trees that should

23   not be logged." – CC, 2nd Scoping);

24   • FS-3547 ("The NWFP, the Recovery Plan, and numerous

25   scientific papers all use diameter limits regarding

26   tree retention in owl habitat.  The fact the Mendocino

27   steadfastly refuses to adopt diameter limits makes all

28   projects in owl habitat suspect." – CC, 2nd Scoping);

- FS-3552 ("The Forest states that 'tree diameters in
  Smokey would be much larger, averaging 22" dbh and
  higher.'  However, it fails to mention what the average
  diameter could be if it implemented a restriction on
  the size of trees being cut (i.e. no trees harvested
  over 24" dbh)." – CC, 2nd Scoping);

- FS-3553 ("The removal of small dimeter trees would
  improve the foraging habitat for Northern spotted owls.
  However, this project also proposed to remove large
  diameter trees. . . . [R]emoving the forest (or
  critical habitat components – large trees) is not
  compatible with the stated purpose of this project." –
  CC, 2nd Scoping).

The record is full of suggestions and concerns regarding diameter caps (18", 20", and 24") and retention of larger trees, and Defendants fail to explain why none of these triggered the HFRA requirement to prepare a single additional alternative. Although Plaintiff did not explicitly frame its suggestion as a "proposed alternative," the sampling of comments above show that Plaintiff did more than just mention a diameter cap "in passing." As Defendants note, "[p]ersons challenging an agency's compliance with NEPA must structure their participation so that it alerts the agency to the parties' position and contentions."  D. Rep. at 4–5 (quoting Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004)).  Plaintiff—and others—did so here and the Court finds that the USFS's decision not to consider, or even acknowledge, an alternative with a larger diameter cap was arbitrary and capricious.

1      4.   Failure To Take a "Hard Look" At Project's
            Impacts

2

3          Plaintiff argues that even if the Project does not require

4     an EIS, the USFS still failed to take a hard look at the impacts

5     of the Project in violation of NEPA.  See Neighbors of Cuddy

6     Mountain v. Alexander, 303 F.3d 1059 (9th Cir. 2002).  On this

7     question, the Court primarily looks to the USFS's analysis in the

8     EA, the underlying reports referenced therein, and the

9     Supplemental Information Report, keeping in mind NEPA's twin aims

10    of fostering better decision making and informing public

11    participation for actions that affect the environment.  See Ore.

12    Natural Res. Council Action v. U.S. Forest Service, 293 F. Supp.

13    2d 1200, 1204 (D. Ore. 2003).

14         An EA is a "concise public document" that briefly provides

15    sufficient evidence and analysis for determining whether to

16    prepare an EIS; it aids an agency's compliance with NEPA when no

17    EIS is necessary and facilitates EIS preparation when one is

18    necessary.  40 C.F.R. § 1508.9(a).  It must include "brief

19    discussions of the need for the proposal, of alternatives as

20    required by [NEPA], of the environmental impacts of the proposed

21    action and alternatives, and a listing of agencies and persons

22    consulted."  40 C.F.R. § 1508.9(b).  NEPA's requirements ensure

23    "that the agency, in reaching its decision, will have available,

24    and will carefully consider detailed information concerning

25    significant environmental impacts; it also guarantees that the

26    relevant information will be made available to the larger

27    audience that may also play a role in both the decisionmaking

28    process and the implementation of that decision."  Ore. Natural

38

1  <u>Res. Council Action</u>, 293 F. Supp. 2d at 1204–05 (citations and

2  quotation marks omitted).  The Court is thus charged with

3  reviewing the adequacy of the agency's analysis, while keeping in

4  mind that it is not the Court's role to order the agency to

5  explain every possible scientific uncertainty.  <u>See</u> <u>The Lands</u>

6  <u>Council v. McNair</u>, 537 F.3d 981, 986 (9th Cir. 2008).

7       As previously explained, the USFS's failure to consider or

8  address the alternatives raised during public collaboration

9  renders the EA inadequate.  This deficiency is one indication

10 that the agency failed to take a hard look at the Project's

11 impacts.  Plaintiff raises several other concerns that further

12 support such a finding.

13      The Limited Operating Period is stated inconsistently

14 throughout the record, making it difficult for Plaintiff, the

15 Court, the public, and perhaps even the agency to know exactly

16 how the LOP operates.  The DN/FONSI states that the Project

17 incorporates the LOP required by the 2012 BiOp's ITS, but

18 Appendix A of the EA states the LOP in different terms.  <u>Compare</u>

19 FS-18792 ("Implement a limited operating period . . . in the

20 units containing suitable nesting/roosting or foraging habitat.

21 . . . If current protocol-level survey information is not

22 current/available, a limited operating period [will be

23 implemented within] . . . any unsurveyed nesting/roosting

24 habitat." – 2012 BiOp) <u>with</u> FS-77 ("A limited operating period

25 (LOP) for northern spotted owls would be applied to all units

26 from February 1 to September 15 unless current protocol-level

27 surveys indicate that they are unnecessary." – EA, Appendix A).

28 The LOP again changes in the Supplemental BiOps (2014 and 2015),

though the USFS states it will adhere to the LOP as written in the 2012 ITS.  In April of last year, the USFS sent Trinity a letter listing the units where an LOP from February 1st to September 15th would apply, an LOP from February 1st to July 10th would apply, and where no LOP would apply in the event that no protocol surveys are not conducted in a given year.  ECF No. 86-1.  This advice conflicts with the LOP as written in Appendix A of the EA.  Intervenor offers an explanation of how the list is consistent with the LOP as written in the 2012 BiOp's ITS, but that explanation is not readily discernable from the EA or the accompanying documents.  <u>See</u> I. Cr. Mot. at 19.  Even counsel's explanation at the hearing relied on data from several different sources; a clear and consolidated explanation is found nowhere in the record or documents made available to the public.  The confusion makes it difficult to discern the Project's impacts in the circumstance that current protocol level surveys are unavailable.  It also makes it difficult for the public to play a role in the decision-making process or project implementation, running counter to one of NEPA's principal aims.

As noted previously, this Court is concerned by the fact that the USFS has admittedly failed to do the monitoring required for other projects.  Although the Court declines to find that this deficiency mandates preparation of an EIS, the fact that the agency fails to address this issue in its decision documents raises suspicion.  While the concern is noted in Appendix Z of the EA, the agency merely admits that monitoring has not occurred and offers no explanation of why, no description of how the issue will be ameliorated, and no rationale for why this deficiency

1  does not render the Project's impacts "uncertain."  It does not
2  appear the agency took a hard look at this question.

3       Plaintiff raises a number of other issues with the EA, most
4  of which lack merit because the concerns are addressed in the
5  Appendices and cited underlying reports.  Of those concerns, the
6  Court agrees that the EA contains varying statistics regarding
7  the number of acres to be treated; while a thorough read of the
8  decision documents clarifies these differences, the EA's lack of
9  precision does make the document confusing.  Although this issue
10 would not likely, by itself, warrant a finding against the USFS,
11 the agency would be wise to be more careful in its revision.

12      Given the failure to address reasonable alternatives, the
13 inconsistent LOPs, and the failure to address past monitoring
14 practices, the Court finds that the USFS did not conform to NEPA
15 and take the requisite hard look at the Project.

16          5.   Failure to Prepare a Supplemental EA or EIS

17      Although Supplemental Information Reports are not mentioned
18 in NEPA or its regulations, courts recognize a "limited role" for
19 them in environmental evaluation procedures.  Idaho Sporting
20 Congress Inc. v. Alexander, 222 F.3d 562, 566 (9th Cir. 2000).
21 Courts have upheld their use in an agency's determination of
22 whether new information or changed circumstances require the
23 preparation of a supplemental EA or EIS.  Id.  "If the
24 environmental impacts resulting from the design change are
25 significant or uncertain, as compared with the original design's
26 impacts, a supplemental EA is required."  Id.
27 ///
28 ///

1    Plaintiff primarily argues that the SIR is arbitrary and

2    capricious because it fails to address the USFS's "design change"

3    in the LOP.  P. MSJ at 24.  The argument is based on the April 1,

4    2016 letter from the USFS to Trinity.  P. MSJ at 24; P. Rep. at

5    25; ECF No. 86-1.  The agency prepared the SIR in 2015 and thus

6    this letter was not before it.  The Court acknowledges that the

7    LOP determinations and the 2016 letter are confusing.  This

8    concern is best addressed in the "hard look" analysis, above.

9    Plaintiff also argues that the USFS "piggybacks" on the

10   FWS's no-jeopardy conclusion in the 2014 BiOp and thus failed to

11   take a "hard look" at the impacts of the change in the NSO's

12   critical habitat designation.  P. MSJ at 24.  This is not the

13   case.  The SIR relies on the BiOp in part, but does so broadly

14   and in addition the 2014 Supplemental BA.  The SIR cites to the

15   lengthy analysis in both documents in support of its conclusion

16   that "[t]he Smokey Project will have long term beneficial effects

17   on [NSO] habitat and any adverse impacts to designated critical

18   habitat would be minor and temporary."  FS-3-5.  Plaintiff does

19   not claim the Supplemental BA was inadequate.  Plaintiff points

20   out that the USFS did not mention the declining NSO population in

21   the SIR, but Plaintiff does not explain how this renders the

22   determination inadequate.

23   In sum, the Court finds that the USFS's decision not to

24   prepare a Supplemental EA or EIS was not arbitrary and capricious

25   and finds for Defendants on this claim.

26   D.   ESA Claims

27   The ESA requires any federal agency seeking to implement a

28   project that could adversely affect the habitat of an endangered

or threatened species to go through a formal consultation process

with the FWS.  16 U.S.C. § 1536(a)(2); Gifford Pinchot Task Force

v. U.S. Fish & Wildlife Service, 378 F.3d 1059, 1063 (9th Cir.

2004).  Before the consultation begins, the agency must submit a

"biological assessment for the purpose of identifying any

endangered species or threatened species which is likely to be

affected" by the agency's proposed action.  16 U.S.C. § 1536(c).

Prior to and during the consultation process, the federal agency

and the FWS must use the "best scientific and commercial data

available."  16 U.S.C. § 1536(a)-(c).  At the end of the formal

consultation process, the FWS must issue a Biological Opinion

("BiOp").  16 U.S.C. § 1536(b)(3)(A).  A BiOp is a "written

statement setting forth the Secretary's opinion, and a summary of

the information on which the opinion is based, detailing how the

agency action affects the species or its critical habitat."  Id.

If the FWS believes that the project will jeopardize a listed

species or adversely modify the species' habitat, "the Secretary

shall suggest those reasonable and prudent alternatives which he

believes would not violate subsection (a)(2) and can be taken by

the Federal agency or applicant in implementing the agency

action."  Id.  The biological opinion is considered a final

agency action and is subject to judicial review.  Nat'l Wildlife

Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 925 (9th

Cir. 2007).

The ESA also prohibits any federal agency from "taking" a

listed species.  16 U.S.C. § 1538(a)(1).  To "take" means to

harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

collect, or to attempt to engage in any such conduct."  16 U.S.C.

§ 1532 (19).  If the federal action will result in the taking of an endangered or threatened species incidental to the agency action, the action may still go forward if the FWS approves of it through an Incidental Take Statement ("ITS"). 16 U.S.C. § 1536 (b)(4); Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, 273 F.3d 1229, 1239 (9th Cir. 2001).  The ITS specifies the impact of the incidental take on the species, the measures necessary or appropriate to minimize impact, and the terms and conditions that must be complied with by the applicant agency to implement those measures.  Id.  If an agency modifies the action it intends to take or does not comply with the ITS, the agency must reinitiate consultation with FWS.  50 C.F.R. § 402.16.

  1.   Arbitrary and Capricious Supplemental Biological Opinion

     The jeopardy and adverse modification determinations are made pursuant to governing regulations.  To "'jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02. "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species."  Id.  The Ninth Circuit has held that the reviewing agency must consider both recovery and survival impacts in these determinations. Nat'l Wildlife Fed'n, 524 F.3d at 930 (9th Cir. 2007) (holding that the jeopardy definition requires consideration of recovery);

1   Gifford Pinchot Task Force, 378 F.3d at 1070 (holding that the

2   adverse modification regulations "singular focus" on survival

3   violated the ESA).  However, it is not necessary that a federal

4   action would itself implement or bring about recovery.  Cascadia

5   Wildlands v. Thrailkill, 49 F. Supp. 3d 774, 787 (D. Ore. 2014).

6        In making these determinations, an agency must use the best

7   available scientific and commercial data available.  16 U.S.C.

8   § 1536(a)(2); see San Luis & Delta-Mendota Water Auth. v. Jewell,

9   747 F.3d 581, 601–02 (9th Cir. 2014).  Insufficient or incomplete

10  information does not excuse an agency's failure to comply where

11  there was some additional superior information.  Jewell, 747 F.3d

12  at 602.  However, "where the information is not readily

13  available, we cannot insist on perfection."  Id.  Where a

14  plaintiff fails to point to data omitted from consideration, the

15  claim fails.  Kern Cnty. Farm Bureau v. Allen, 450 F.3d 1072,

16  1081 (9th Cir. 2006).

17       Plaintiff provides four reasons why the operative BiOp, the

18  Second Supplemental BiOp, fails to satisfy the ESA and is thus

19  arbitrary and capricious.

20       First Plaintiff argues that the FWS's determination that the

21  Project will not jeopardize the NSO or adversely modify its

22  critical habitat is irrational due to the FWS's own contrary

23  findings.  P. MSJ at 26.  Plaintiff directs the Court to a line

24  in the BiOp where the FWS indicated that the Project is

25  inconsistent with the 2011 RRP.  FS-19319-20 ("The proposed

26  action meets most of the recommendations of the Recovery Plan,

27  but is inconsistent with portions of Recovery Action 10[.]").

28  Because the FWS must consider NSO recovery in its analysis,

45

1    Plaintiff argues that FWS's determination that the Project is

2    inconsistent with "the critical recovery action" contradicts its

3    jeopardy and adverse modification determinations.  P. MSJ at 27.

4         The FWS adequately considered NSO recovery in its analysis,

5    Plaintiff just does not agree with its conclusions.  See FS-

6    19319-21. First, the agency's finding that the Project is

7    inconsistent with portions of one recovery action is not

8    dispositive because the 2011 RRP, and the recommended recovery

9    actions contained therein, is not a regulatory document and is

10   not binding on the agency.  See Conservation Cong. v. Finley, 774

11   F.3d 611, 614 (9th Cir. 2014); Cascadia Wildlands v. Thrailkill,

12   49 F. Supp. 3d at 787.  Furthermore, a fair reading of the 2011

13   RRP and Recovery Action 10 reveals that the plan anticipates the

14   balance of competing forest management goals and acknowledges

15   that short-term habitat degradation may sometimes be appropriate

16   to achieve long-term forest health.  See Conservation Cong. v.

17   Heywood, 2:11-cv-02250, 2015 WL 5255346, at *12 (E.D. Cal. Sep.

18   9, 2015) ("Thus, the RRP does not recommend forgoing all land

19   management activities to avoid short-term consequences to the

20   NSO, and instead appears to support the proper implementation of

21   projects like this.").  The FWS's conclusion indicates the

22   Project comports with this guidance: "Short-term adverse effects

23   to [NSOs] in the action area due to project implementation are

24   not expected to preclude recovery of the species in the recovery

25   unit ICC or rangewide.  Long-term, the Smokey Project will

26   provide benefits to the [NSO] through increased resiliency of

27   habitat." FS-19321.  No violation is found on this basis.

28   ///

1      Plaintiff next argues that the FWS's endorsement of the

2  placement of Activity Centers is not rationally connected to NSO

3  habitat needs.  P. MSJ at 27.  Specifically, Plaintiff takes

4  issue with the placement of Activity Center 3063 and directs the

5  court to the USFS biologist's characterization of her work as a

6  "crap shoot."  FWS-2873.  Plaintiff argues that this admission of

7  "speculation and surmise" and "shoddy work" does not meet the

8  requisite level of caution and expertise.  P. MSJ at 27–28.

9      These comments occurred in the context of a larger

10  conversation.  In a phone meeting, employees from both services

11  decided that two additional Activity Centers should be designated

12  in the Project's action area and that the two MNF employees would

13  "determine where to place the AC cite on the landscape, based on

14  information from the 2013 survey report (the direction in which

15  the pair flew off once they were offered mice) and the best

16  habitat available."  FWS-2872.  Following that conversation, the

17  USFS biologist sent the FWS biologist an email that said: "This

18  new AC designation is going to be a crap shoot.  Take a look in

19  Google Earth – the best stuff looks to be about ½ mile east from

20  the 2013 pair sighting."  FS-2873.  The biologists continued

21  their consultation over email for several days, which involved

22  multiple maps and images, survey data, and discussion of best

23  suitable habitats.  FWS-2873–81, 2887–88, 2901–04, 2926, 2930–31.

24  The USFS biologist sent a map to FWS with the statement, "Here's

25  my guess at what's nesting/roosting and foraging.  Let me know

26  what you think and I'll charge forward from there."  FWS-2894.

27      Although the USFS's candid commentary may indicate that the

28  new Activity Center was not determined to the degree of

47

1   scientific certainty Plaintiff desires, Plaintiff does not

2   present any data that the agencies failed to consider in making

3   the determination.  Plaintiff refers to the FWS's Activity Center

4   delineation "protocol," but the cited "protocol" says nothing

5   about the way in which the agencies identify the location for a

6   new activity center.  See P. MSJ at 27 (citing FWS-1162) ("The

7   U.S. Fish and Wildlife Service also uses a 0.5 mile radius circle

8   around a [NSO] activity center to delineate the area most heavily

9   used by the subspecies during the nesting season, also known as

10  the core area.").  Plaintiff states that the USFS located the

11  core area associated with Activity Center 3063 "in such a way

12  that the relevant NSO pair's nest site is outside of the core

13  area."  P. Rep. at 30.  However, it does not appear that

14  surveyors discovered an actual nest site, only that they detected

15  owls that were "likely nesting," and the biologists based the

16  activity center location on the direction the owls flew in and

17  the habitat in the area.  FS-19303; FWS-2872.  Plaintiff's

18  argument amounts to a challenge of the agencies' interpretation

19  of the available data, to which this Court owes deference.

20      Third, Plaintiff argues that the BiOp fails to contain any

21  analysis whatsoever of how the Project, together with other

22  timber sale projects, will affect the continuing function of the

23  Buttermilk LSR which is crucial to the conservation and continued

24  survival of the NSO in northwestern California.  P. MSJ at 28.

25  The relevant regulations only require the agency to form an

26  opinion as to whether the action, taken together with cumulative

27  effects, is likely to jeopardize the continued existence of

28  listed species or result in the destruction or adverse

1   modification of critical habitat.  50 C.F.R. § 402.14(g).

2   Plaintiff does not cite any authority for the proposition that

3   the FWS needed to evaluate the continuing function of the

4   Buttermilk LSR in its analysis.  The Court will not impose such

5   an obligation.

6        Finally, Plaintiff argues that the Operative BiOp is

7   arbitrary and capricious because the LOP requirement in the

8   Incidental Take Statement is different than the one in the 2012

9   BiOp.  Specifically, the Operative BiOp does not appear to

10  protect unsurveyed nesting/roosting habitat in the event that

11  protocol level survey information is not current/available, in

12  contrast with the 2012 BiOp, which offers protection in that

13  situation.  P. MSJ at 28; compare FS-18792 with FS-19325.

14  However, the Operative BiOp is based on the Second Supplemental

15  BA, which states that it intends to incorporate the terms and

16  conditions of the 2012 BiOp, and thus the original LOP.  The

17  conservation measures in the Supplemental BA must be implemented,

18  see FS-19290, and thus the original LOP is incorporated into the

19  BiOp; the Court need not determine whether it was arbitrary and

20  capricious for the FWS to approve the Project with a differently

21  worded LOP.

22            2.   The USFS's Failure to Insure Against Jeopardy and
                    the Destruction or Adverse Modification of
23                  Critical Habitat

24       Plaintiff claims that the USFS's authorization of the

25  Project violates its substantive ESA Section 7(a)(2) duty not to

26  undertake actions that "jeopardize" a listed species or

27  "adversely modify" its habitat.  P. MSJ at 29.  Plaintiff argues

28  that the USFS violated its obligations both because the BiOp is

1    legally flawed and because new information undercuts the BiOp.[5]

2         "Arbitrarily and capriciously relying on a faulty Biological

3    Opinion" would violate an agency's Section 7 duties.  Wild Fish

4    Conservancy v. Salazar, 628 F.3d 513, 532 (9th Cir. 2010).  "An

5    agency's reliance on a biological opinion based on 'admittedly

6    weak' information satisfies its ESA obligations as long as the

7    challenging party can point to no new information undercutting

8    the opinion's conclusions."  Id.

9         Both of Plaintiff's arguments must fail.  First, the Court

10   has determined that the BiOp is legally sufficient.  Further,

11   contrary to Plaintiff's assertion in its Reply, the BiOp does

12   address road maintenance activities.  FS-19284.  Second, the new

13   information Plaintiff points to is the letter from the USFS to

14   Trinity indicating which units will have a LOP if and when no

15   current protocol level surveys are performed.  ECF No. 86-1.

16   This letter does not provide new information; it is the Forest

17   Supervisor's interpretation of the Project's terms and

18   conditions.  As noted several times in this Order, the USFS will

19   need to clarify the LOP so that the public and the agencies (and

20   the courts) know what compliance looks like.  However the Court

21   does not hold, as a matter of law, that the USFS violated the ESA

22   in issuing the letter.

23              3.   USFS's Illegal and Prohibited Take

24        Plaintiff argues that because the BiOp is arbitrary and

25   capricious, the Incidental Take Statement is invalid and all

26

27   [5] This argument relies, in part, on a declaration that has been
     stricken from the record.  The Court will not consider
28   Plaintiff's argument based on that declaration.

1  incidental take will be unauthorized and illegal. Plaintiff's

2  argument rests solely on the Court's determination with respect

3  to the BiOp. As the Court has found that the BiOp is not

4  arbitrary and capricious, this claim also fails.

5       E.   NFMA Claim

6       "[T]he NFMA requires the Forest Service to develop a forest

7  plan for each unit of the National Forest System." The Lands

8  Council v. McNair, 537 F.3d 981, 988 (9th Cir. 2008); 16 U.S.C.

9  § 1604(a). "After a forest plan is developed, all subsequent

10  agency action, including site-specific plans . . . must comply

11  with the NFMA and be consistent with the governing forest plan.

12  Id. (citing Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d

13  957. 962 (9th Cir. 2002)); 16 U.S.C. § 1604(i).

14      By its terms, the Mendocino National Forest Plan

15  incorporates the NSO Recovery Plan. See Conservation Cong. v.

16  U.S. Forest Service, No. 2:15-00249, 2016 WL 727272 (E.D. Cal.

17  Feb. 24, 2016) (finding that a similarly worded forest plan

18  incorporates the NSO Recovery Plan). The Forest Plan's "Summary

19  of the Analysis of the Management Situation: Resource

20  Environment" states, with respect to wildlife and fish:

21  "Management activities will comply with species recovery plans

22  (threatened and endangered species) and habitat management plans,

23  as they apply to the Mendocino National Forest." P. MSJ at 20;

24  FS-5811 (emphasis added). In a later section on "Management

25  Direction: Management Prescriptions," the Plan states: "Late-

26  Successional Reserves are to be managed to protect and enhance

27  conditions of late-successional and old-growth forest ecosystems,

28  which serve as habitat for late-successional and old-growth

51

1  related species including the northern spotted owl. . . .

2  Activities required by recovery plans for listed threatened and

3  endangered species take precedence over LSR standards and

4  guidelines." FS-5819 (emphasis added).

5      Plaintiff argues that the Project violates the 2011 RRP for

6  the NSO and is thus inconsistent with the Forest Plan and

7  violates the NFMA. P. MSJ at 20. Defendants argue that the plan

8  does not impose mandatory requirements. D. Cr. Mot. at 20.

9      Although "recovery plan objectives are discretionary for

10  federal agencies," Heywood, 2015 WL 5255346, at *1, that rule

11  does not end the Court's inquiry. "[W]here an otherwise advisory

12  document has been clearly incorporated into a Forest Plan or

13  other binding document, its requirements become mandatory."

14  Ecology Ctr. v. Castaneda, 574 F.3d 652, 660 (9th Cir. 2009).

15  When such a document is incorporated into a forest plan, courts

16  look to the language of the guideline to determine whether it

17  creates a mandatory standard. Id. at 660. "[T]he presence of a

18  few, isolated provisions cast in mandatory language does not

19  transform an otherwise suggestive set of guidelines into binding

20  regulations." Id. "If the guideline language underlying the

21  plaintiff's claim is merely advisory or aspirational, the answer

22  must be 'no.'" Id. For instance, where a Forest Plan

23  incorporated "Old Growth Guidelines," the Ninth Circuit declined

24  to mandate compliance because the relevant portions were cast in

25  suggestive (i.e. "should" and "may") rather than mandatory

26  ("must" and "only") terms. Id. at 660-61.

27      Applying these principles to the present dispute, it is

28  clear that the cited sections of the 2011 RRP are merely

1   suggestive and do not impose mandatory terms on the USFS.

2       Plaintiff first argues that the Project violates Recovery

3   Action 10.  In the 2014 and 2015 BiOps, the FWS expressly found

4   that the Project "is inconsistent with portions of Recovery

5   Action 10" in the 2014 BiOp as proof of this claim.  P. MSJ at

6   20.  The Recovery Action recommends that the USFS "retain and

7   protect all current and historically occupied NSO habitat."  P.

8   Rep at 19-20.

9       The Court finds that the language of Recovery Action 10 is

10  suggestive and framed in a manner that anticipates the balancing

11  of competing goals.  The RRP's Executive Summary defines Recovery

12  Actions as "near-term recommendations to guide the activities

13  needed to accomplish the recovery objectives and achieve the

14  recovery criteria."  FS-4239.  Further, most of Recovery Action

15  10 consists of "interim guidance."  This guidance suggests (i.e.

16  "Land managers should . . .") priorities for consideration, but

17  recognizes the need for balance:

18          As a general rule, forest management activities that
            are likely to diminish a home range's capability to
19          support spotted owl occupancy, survival and
            reproduction in the long-term should be discouraged.
20          However, we recognize that land managers have a variety
            of forest management obligations and that spotted owls
21          may not be the sole driver in these decisions.  Here,
            active forest management may be necessary to maintain
22          or improve ecological conditions.

23  FS-4311-12.  The Court cannot read this section to impose

24  mandatory requirements on the USFS and thus it does not find a

25  violation.

26      Plaintiff also contends that the Project is inconsistent

27  with the adaptive management approach to forest management that

28  the RRP prescribes.  See P. Rep. at 3-7.  While Plaintiff is

1  correct that adaptive management receives special emphasis in the

2  2011 RRP, these objectives do not impose mandatory requirements

3  on the USFS for specific projects.  The RRP explains:

4          In order to deal with uncertainty and risk the Service
           will employ an active program of adaptive management.
5          Adaptive management includes identifying areas of
           uncertainty and risk, implementing a research and
6          monitoring approach to clarify these areas, and making
           decisions to change management direction that is not
7          working while still maintaining management flexibility.
           Where possible, the implementation of the recovery
8          actions included within this Revised Recovery Plan
           should be designed in a manner that provides feedback
9          on the efficacy of management actions such that the
           design of future actions can be improved.
10

11  FS-4260 (emphasis added).  Adaptive management is thus a tool

12  that the FWS intends to use to gather knowledge for best managing

13  the species. See FS-4262.  FS-4280.  The Court cannot read these

14  objectives to require that every project be implemented with

15  "rigorous monitoring and [an] adaptive management program"

16  attached.  See P. MSJ at 4.  Again, there is no violation.

17      In its Reply, Plaintiff argues that the cutting of larger

18  trees and simplification of vertical and horizontal structures

19  violate the 2011 RRP.  P. Rep. at 5-6.  The Court finds that the

20  sections Plaintiff cites are also cast as "recommendations" and

21  do not impose mandatory obligations on the USFS.  See, e.g., FS-

22  4253 ("In order to reduce or not increase this potential

23  competitive pressure while the threat from barred owls is being

24  addressed, this Revised Recovery Plan now recommends conserving

25  and restoring older, multi-layered forest across the range of the

26  spotted owl.").  The USFS did not violate the RRP for these

27  reasons either.

28  ///

1    The Court finds that the USFS did not violate the NFMA on
2    Plaintiff's argued basis.

3                          IV.   ORDER

4        For the reasons set forth above, the Court GRANTS
5    Plaintiff's Motion for Summary Judgment on the First Claim for
6    Relief (Failure to Take a Hard Look) and the Fourth Claim for
7    Relief (Failure to Develop a Reasonable Range of Alternatives) of
8    the Second Amended Complaint.  ECF No. 65.  The Court DENIES the
9    motion with respect to the remaining Claims for Relief and thus
10   GRANTS Defendants' and Intervenor's Cross Motions for Summary
11   Judgment on the Second, Third, Fifth, Sixth, Seventh, Eighth, and
12   Ninth Claims for Relief, and the Supplemental Complaint, ECF No.
13   102.  The Court will issue a separate Order regarding the
14   relief/remedy to be imposed after receipt and consideration of
15   the parties' supplemental briefs on this issue.

16       IT IS SO ORDERED.

17   Dated:  February 16, 2017

18
19                                    JOHN A. MENDEZ,
                                      UNITED STATES DISTRICT JUDGE
20
21
22
23
24
25
26
27
28