1

2

3

4

5

6

7                      UNITED STATES DISTRICT COURT

8                      EASTERN DISTRICT OF CALIFORNIA

9

10   CONSERVATION CONGRESS,              No.  2:13-cv-01977-JAM-DB

11            Plaintiff,

12       v.                             **ORDER GRANTING DEFENDANTS'**
                                        **MOTION TO AMEND THE JUDGMENT AND**
13   UNITED STATES FOREST SERVICE       **DISSOLVE THE INJUNCTION**
     and UNITED STATES FISH AND
14   WILDLIFE SERVICE,

15            Defendants,

16       and

17   TRINITY RIVER LUMBER COMPANY,

18            Intervenor
              Defendant.
19

20

21                          **I. INTRODUCTION**

22       Conservation Congress ("Plaintiff") sued the United States

23   Forest Service ("USFS") and the United States Fish and Wildlife

24   Service ("FWS") for violations of the National Environmental

25   Policy Act ("NEPA"), the Endangered Species Act ("ESA"), the

26   National Forest Management Act ("NFMA"), and the Administrative

27   Procedure Act ("APA") related to the Smokey Project (or

28   "Project").  The Smokey Project is a plan to administer fuel and

                                    1

vegetative treatments to further habitat and fire management goals in the Mendocino National Forest. The project will also contribute to timber production. The Trinity River Lumber Company ("Trinity") intervened in the case; Trinity purchased the stewardship contract for the Smokey Project and will be harvesting trees ones the Project commences. About a year ago, this Court granted Plaintiff summary judgment on two of its claims against the USFS, remanded the Project to the agency to cure the noted defects, and enjoined tree harvesting of trees exceeding 20 inches dbh. Now the USFS and Intervenor move the Court to dissolve the injunction (ECF No. 162).[1]

## II. FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

On February 16, 2017, the Court granted Plaintiff's Motion for Summary Judgment on its claims that the USFS failed to take a hard look and failed to develop a reasonable range of alternatives in analyzing the proposed Smokey Project (the First and Fourth Claims).

Specifically, the Court found that the USFS:

- Failed to address reasonable alternatives, specifically the suggested diameter caps, SJ Order (ECF No. 121) at 31-37, 39;

- Stated the Limited Operating Period inconsistently throughout the record, id. at 39-40; and

- Failed to address how its failure to do the monitoring required for other projects impacts the Smokey Project. Id. at 40-41.

---

[1] A hearing was held on this motion on February 27, 2018.

The Court also expressed concern that the Environmental Assessment contained varying statistics regarding the number of acres to be treated that, without much explanation of these differences, made the document confusing. Id. at 41. The Court did not however include this issue as a ground for its decision.

In all other respects, the Court found in favor of Defendants and granted their and Intervenor's Cross Motions for Summary Judgment on the Second, Third, Fifth, Sixth, Seventh, Eighth, and Ninth Claims, and the Supplemental Claim.

The Court requested further briefing on the proper remedy and issued a Final Judgment on May 26, 2017 (ECF No. 142). The Court remanded the Project to the USFS with instructions to prepare supplemental NEPA analysis that cures the NEPA violations identified in the Court's Merits Order and complies with the applicable statutes. Final Judgment at 7. If the USFS concluded that no EIS would be required, it was ordered to circulate the analysis and draft revised DN/FONSI to the public. Id. The Court ordered the USFS to accept objections for a 20-day period from eligible parties and complete its supplemental documentation and public involvement process no later than December 1, 2017. Finally, the Court enjoined Defendants and Intervenor from removing any trees with 20 inches dbh or greater. The Court retained jurisdiction to dissolve the injunction upon a showing that the USFS has complied with this Court's Order and satisfied its obligations under NEPA. Id. at 8.

The USFS issued a Draft Supplement to the Smokey Project Environmental Assessment on September 27, 2017. Mot. at 2; Obj. Let. at 1. Plaintiff submitted objections on October 16 and 17,

2017. Id.; Pl. Obj.  The USFS responded to those objections.

Obj. Resp., ECF No. 162-3.  The USFS then issued its Supplement

to Environmental Assessment and an affirmation of its prior

DN/FONSI (Decision Notice and Finding of No Significant Impact)

on November 27, 2017.  SEA; Aff. Dec.

### III. OPINION

#### A.  Legal Standards

A district court may relieve a party from a final judgment

under Federal Rule of Civil Procedure 60(b).  Rule 60(b)(5)

allows courts to relieve a party or its legal representative from

a final judgment, order, or proceeding if the judgment has been

satisfied, released or discharged.  "A party seeking modification

or dissolution of an injunction bears the burden of establishing

that a significant change in facts or law warrants revision or

dissolution of the injunction." Sharp v. Weston, 233 F.3d 1166,

1170 (9th Cir. 2000).  "A significant change is one that pertains

to the underlying reasons for the injunction." Moon v. GMAC

Mortg. Corp., No. C08-969Z, 2008 WL 4741492, at *2 (W.D. Wash.

Oct. 24, 2008).

In deciding whether to dissolve an injunction, the Court's

review of the agency's action is limited to the scope of the

prior litigation and the injunction order at issue.  See Today's

IV, Inc. v. Federal Transit Administration, No. LA CV13-00378 JAK

(PLAx), 2016 WL 741685, at *6-7 (C.D. Cal. Feb. 5, 2016) (citing

Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 162 (2010)).

It is not an opportunity for a plaintiff to raise issues that

were not addressed in the summary judgment order.  Id.  New

claims must be presented through a new action and cannot serve as

4

a basis to deny a request to dissolve the injunction.  Id.; see also Orantes-Hernandez v. Gonzales, 504 F. Supp. 2d 825, 844 (C.D. Cal. 2007) (finding a new due process claim exceeds the permissible scope of the court's inquiry in deciding the government's motion to dissolve the 1988 injunction).  These limitations build upon a principle common to all federal litigation, a plaintiff cannot raise claims it failed to put the defendant on notice of by its complaint.  See Pickern v. Pier 1 Imports, Inc., 457 F.3d 963, 968 (9th Cir. 2006).

In addition to these principles, Intervenor argues, citing Heartland Regional Medical Center, that the Court need not evaluate the merits of the remand decision before dissolving the injunction.  Joinder, ECF No. 165, at 4.  In Heartland Regional Medical Center v. Leavitt, the D.C. Circuit found that where a court remanded a case to an agency due to the agency's failure to consider or respond to reasonable alternatives, the agency complied with the judgment by filling the analytical gap and incorporating its rationale for rejecting those alternatives into the decision documents.  415 F.3d 24, 29 (D.C. Cir. 2005).  But, the Circuit explained, "whether or not the agency's [post-remand] rejection of the alternatives was arbitrary is a determination that must be made in [a] separate APA action challenging [the agency's] post-remand decisions."  Id. at 30.  While this discussion favors a narrow construction of the action required on remand, its instructive value in the present case is very limited because the Heartland decision involved a plaintiff's motion to enforce a judgment, not a decision whether to dissolve an injunction.  The more appropriate standards on this motion are

cited above.

"NEPA imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." Winter v. NRDC, 555 U.S. 7, 23 (2008) (internal quotations omitted). "NEPA . . . simply guarantees a particular procedure, not a particular result." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 737 (1998).

**B.   Argument Summary**

The USFS seeks dissolution of the injunction. ECF No. 162. It argues, and provides supporting documentation to show, that it has addressed the Court's three main concerns in its supplemental analysis. Additionally, the Supplemental Environmental Assessment ("SEA") clarifies the Project's acreage figures and explains the confusion from earlier iterations of this data. Intervenor joined in this motion, adding some additional arguments and explaining that it has not commenced cutting because the Project was not economically feasible with the Court's diameter cap. Joinder at 2.

Plaintiff opposes the motion. ECF No. 166. First, it argues that the failure to conduct a detailed analysis of a single "action alternative" to the Smokey Project is a violation of NEPA's alternative analysis requirement. Opp'n at 2. It contests the USFS's alternatives analysis as (1) skewed toward selecting an alternative with intensive cutting, (2) based upon fire conditions likely to occur during 97th percentile weather conditions (which it claims is arbitrary and capricious), (3) flawed by its failure to explain why the only analyzed action

6

alternative calls for tree cutting far more extensive than necessary, and (4) contrary to underlying management objective of assuring that tree mortality not exceed 25 percent.  Id. at 4–12. Next, Plaintiff argues that USFS has failed to meet its monitoring obligations from sources like the Mendocino National Forest Land and Resource Management Plan and the USFWS's "2011 Northern Spotted Owl Survey Protocol."  Id. at 13.  Finally, Plaintiff argues that the supplemental analysis failed to clarify the LOPs.

In Reply, the USFS argues that Plaintiff's Opposition seeks to expand the scope of this litigation and raises issues that do not go to the NEPA deficiencies the Court identified in its earlier orders.  Fed. Reply at 1.  It argues that Plaintiff's criticisms are procedurally improper and that it fully complied with the Court's Order.  Id.  Similarly, Intervenor contends that Plaintiff has not shown any deficiencies in the analysis on remand.  Intervenor Reply at 1.  Intervenor also argues, persuasively, that "the deficient alternatives analysis was the foundation of the Court's decision to issue an injunction." Reply at 2; J. Order at 3.  Therefore, the central question in deciding whether or not to dissolve the injunction should be the supplemental alternatives analysis.

### C.  Alternatives Analysis

#### 1.  MSJ Ruling

The purpose and need of a project defines the scope of the alternatives analysis and an agency need only evaluate alternatives that are reasonably related to the project's purposes.  League of Wilderness Defenders-Blue Mountains

Biodiversity Project v. U.S. Forest Service, 689 F.3d 1060, 1069

(9th Cir. 2012).  Courts afford agencies considerable discretion

to define the purpose and need of a project.  Westlands Water

Dist. v. U.S. Dep't of the Interior, 376 F.3d 853, 866 (9th Cir.

2004).  This Court has already deferred to USFS's defined

"purpose and need" of the Project.  SJ Order at 30.

Under NEPA, "[a]gencies are required to consider

alternatives in both EISs and EAs and must give full and

meaningful consideration to all reasonable alternatives."  Te-

Moak Tribe of West. Shoshone of Nev. v. U.S. Dep't of Interior,

608 F.3d 592, 601–02 (9th Cir. 2010).  "The existence of a viable

but unexamined alternative renders an environmental impact

statement inadequate."  Morongo Band of Mission Indians v.

F.A.A., 161 F.3d 569, 575 (9th Cir. 1998) (internal quotation

marks and citation omitted) (applying this rule in the EA

context).  Projects authorized under the Healthy Forest

Restoration Act ("HFRA")—like this one—need only consider three

alternatives: the proposed agency action; the alternative of no

action; and an additional action alternative, if the additional

alternative—(i) is proposed during scoping or the collaborative

process under subsection (f); and (ii) meets the purpose and need

of the project, in accordance with regulations promulgated by the

Council on Environmental Quality.  16 U.S.C. § 6514(c).

The Court previously found that the USFS's failure to

consider or acknowledge an alternative with a larger diameter cap

was arbitrary and capricious, in light of the numerous diameter

cap suggestions made during the collaborative process leading up

to the Project.

## 2. USFS Supplemental Analysis

The USFS cured this deficiency in its Supplement to Environmental Assessment ("SEA"), Section 5, Issue 1 – Range of Reasonable Alternatives. The agency considered 6 alternatives, two versions each of an 18 inches, 20 inches, and 24 inches dbh limit. It concluded that "all six alternatives would be inconsistent with key elements of the Smokey Project's purpose and need, and would fail to achieve the agency's policy objectives for the project." SEA at 5. It explains that the alternatives were considered with two primary purposes in mind: (1) the need to retain NSO foraging habitat, and (2) the need to thin overstory trees. The analysis also notes that the commercial thin units are the only treatments to contribute to timber production, a secondary purpose and need of the Smokey Project. Id. at 5.

The agency concluded that the diameter limit alternatives would fail to sufficiently protect NSO foraging habitat and would significantly reduce the amount of timber offered for sale. Id. at 7. The primary purpose—protecting NSO foraging habitat—was determined by a two part test: "First, the alternative must not cause a direct loss of NSO foraging habitat due to excessive canopy reduction. Second, the alternative must reduce fuel hazard enough to prevent loss of NSO foraging habitat to wildfire. Both tests must be passed for an alternative to be consistent with the project's purpose and need." Id. For the first criteria, the USFS required that an alternative not reduce canopy cover below 40%; anything below that point would not function as foraging habitat and would be downgraded to dispersal

9

habitat.  App. 1 at 2.  For the second, the USFS limited post-
fire basal area mortality to 25 percent or less, as determined
using the Forest Vegetation Simulator ("FVS") model with 97th
percentile weather conditions.  Id. at 3-4.

The diameter caps failed the first round of modeling (18A,
20A, and 24A).  SEA at 8.  The 20A and 24A caps achieved the fuel
reduction goals but resulted in significant reduction in canopy
cover because of the clumpy size class distribution in the
stands.  Id.  The 18A cap retained adequate canopy cover but
failed to achieve the Project's fuel reduction goals.  Id.

The USFS then conducted a second round of modeling with the
same diameter caps but with a different prescription that
constrained canopy cover reduction to the desired minimum level
(18B, 20B, and 24B).  Id.  For each alternative, the constraint
precluded the desired fire hazard reduction goals.  Id.

The USFS explained that because the Proposed Action does not
have a diameter limit, trees can be thinned evenly across all
size class clumps: "the ability to remove some larger trees
allows the Proposed Action to achieve reduction of canopy fuel
hazard in the hard-to-replace larger size class clumps, and to
retain canopy cover in the smaller size class clumps, both of
which comprise the foraging habitat within the commercial thin
units."  Id. at 9.  The agency also noted that only alternatives
20A and 24A would produce enough timber to offer economically
viable sales.

Ultimately, because none of the alternatives were consistent
with the primary purposes of fuel hazard reduction and protection
of mid- and late-successional habitat, the USFS concluded that it

1   would not consider the alternatives in further detail.  <u>Id.</u> at

2   10-11.  Additionally, the agency noted that none of these

3   alternatives produced the level of timber achieved in the

4   Proposed Action.

            3.   <u>Plaintiff's Objections</u>

                    a. The Decision Was Biased Because of USFS's
                       Financial Interest In Harvesting Timber

8        Plaintiff argues the "biased adjudicator" problem is in full

9   force here.  Opp'n at 5.  It latches onto a statement—which seems

10  to be one that describes the USFS generally rather than what

11  specifically occurred in this project—included in the Response to

12  its objections: "The Forest recognizes that their lands can't be

13  protected, as prescribed, if the timber offered is not sold or is

14  at a cost via service contract."  <u>Id.</u> (citing Obj. Resp., ECF No.

15  162-3, at 12).  It refers the Court to a line in Appendix 1, in

16  which the USFS considers the economic viability of the project

17  with the proposed diameter caps: "Such uneconomic volumes could

18  still be produced, by implementing the commercial thinning

19  through a service contract, but this would require substantial

20  Forest Service funding."  <u>Id.</u> (citing App. 1 at 3).  Plaintiff

21  notes several other statements in the record indicating that the

22  USFS's interest in funding influenced its judgment.

23       But, Plaintiffs have failed to cite any authority indicating

24  that the agency's financial interest in a particular outcome

25  renders its decision invalid.  Judge Noonan's concurring comments

26  in the <u>Earth Island Institute</u> cases do not make new law, nor do

27  they provide any guidance to the Court as to how it should

28  account for the agency's financial interests in the project.  <u>See</u>

<u>Earth Island Institute v. U.S. Forest Service</u>, 442 F.3d 1147 (9th Cir. 2006) (Noonan, J. concurring); <u>Earth Island Institute v. U.S. Forest Service</u>, 351 F.3d 1291 (9th Cir. 2003) (Noonan, J. concurring).  In contrast, the USFS cites several authorities—though not directly on point—indicating that the timber production is a permissible consideration in national forest management.  Reply at 3; 16 U.S.C. § 1604(e)(1) ("In developing, maintaining, and revising plans for units of the National Forest System pursuant to this section, the Secretary shall assure that such plans provide for multiple use and sustained yield of the products and services obtained therefrom . . . and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness[.]").

The USFS's supplemental analysis is candid in its consideration of economic factors in implementing the project.  But, this concern was not the Project's primary purpose and it does not appear that financial incentives drove the entire project.  Plaintiff has not shown that the economic viability or advantages of a project is an improper consideration.

The USFS also argues that Plaintiff waived this argument by failing to address it in its Complaint or the Summary Judgment briefing.  Further, Plaintiff did not raise this specific objection in its objections to the SEA, as required for exhaustion purposes.  <u>See</u> Pl. Obj.  It is true that this specific argument appears to be new, though Plaintiff did express concerns related to the economic viability of the project in its Objections.  And, as the USFS notes in footnote 3, this argument appears geared toward challenging the "purpose and need" of the

12

1  project, which the Court already upheld at the summary judgment

2  stage.

3      The Court finds that this biased adjudicator argument fails

4  substantively and appears to be procedurally untimely as well.

5                b. It Was Arbitrary And Capricious For The USFS To
                    Base Its Alternatives Analysis Upon Fire
6                    Conditions Likely To Occur During 97th
                    Percentile Weather Conditions
7

8      Plaintiff contends that the USFS used inflated fire weather

9  conditions—97th percentile—in the alternatives analysis to

10  justify its decision to incorporate large old tree component into

11  the timber sales specifications.  Opp'n at 8.  It points out that

12  this number is inconsistent with the modeling used to prepare the

13  Mendocino National Forest Late Successional Reserve Assessment

14  ("LSRA"), which was at 90th percentile weather conditions.  Id.

15  at 7.

16      The USFS responds to this objection, Obj. Resp. at 8-10, by

17  noting that the choice of 97th percentile weather as the

18  threshold for modeling was relied upon in the Environmental

19  Assessment, Fuels Report, and throughout the project.  It

20  explains that the 97th percentile weather was selected to meet

21  the purpose and need for reductions in potential fire behavior

22  across as broad a spectrum of possible weather scenarios.  Id.

23      The 97th percentile weather conditions measurement was in

24  fact used throughout the Smokey Project, see Environmental

25  Assessment at 5 (citing the Fuels Report) (AR000025), and

26  Plaintiff did not raise this issue in the merits briefing last

27  year.  Reply at 7.  Plaintiff's objection is a new issue and

28  exceeds the scope of the Court's Order.

The USFS also provided an adequate explanation for its decision to use the 97th percentile.  Not only did it address the issue in its Objection Responses, it explains the selection of the 97th percentile in Appendix 1 – Evaluation of Diameter Limit Alternatives under the subheading "Methods of Analysis."  <u>See</u> App. 1 at 4.  The agency explains that "the vast majority of area burned by wildfires is burned by a relatively small number of large wildfires burning under extreme conditions."  <u>Id.</u>  at 4. It addressed the shift from the 90th percentile to the 97th percentile: the higher percentile accounts for climate change and the 97th percentile conditions were judged to approximate 90th percentile conditions over the life of the Project (20 years). <u>Id.</u> at 5.  Plaintiff has failed to cite any authority requiring the USFS to use a different percentile.  Nor has Plaintiff pointed to a rule requiring projects to utilize the 90th percentile weather conditions that was used in the LSRA.  The court finds that it was not arbitrary and capricious for the USFS to use the 97th percentile in the alternatives analysis.

c. The Analysis Is Flawed Because It Does Not Explain Why The Only Analyzed Action Alternative Calls For Tree Cutting Far More Extensive Than Necessary

In its objections to the Supplemental Analysis, Plaintiff contends that the project is generating more timber than necessary for minimum economic viability.  It argues that the USFS's decision to only analyze an alternative that yielded "7 million board feet—almost 50% more than the high end of the 'viable range'—is therefore arbitrary and capricious."  Opp'n at 11.  Plaintiff argues that the USFS's explanation for choosing a

14

project with such a high yield is lacking.  Id.

   First, Plaintiff has not identified a previously proposed, reasonable alternative that both meets the purpose and need of the project and decreases the number of board feet produced.  The USFS provided a reasoned explanation for ruling out the diameter caps.  It does appear that the project produces more board feet than the USFS has acknowledged is necessary for the Project to be economically viable.  See Obj. Resp. at 12.  The USFS does not specifically explain why the Project goes beyond that amount. But it does explain how the Smokey Project's design and the treatments to be performed meet the purpose and need of the project.  It explains why the diameter cap alternatives do not. Plaintiff has not directed the Court to any statute or regulation requiring the USFS to explain itself in the negative (i.e. why it chose not to do something) except as necessary to explain why it did not consider alternatives, which it did.  Plaintiff's approach would require an agency to explain why it did not consider any infinite number of possible project designs.  This does not accord with the HFRA, which only requires the USFS to consider an additional alternative if it is proposed during scoping or the collaborative process under subsection (f) and meets the purpose and need of the project.  16 U.S.C. § 6514(c).

   Second, this challenge goes beyond the scope of the Court's order, which required the USFS to consider the diameter caps suggested during the scoping process.  As such, this argument fails both procedurally and on the merits.

///

///

15

d. The Only Action Alternative Assessed By The USFS Will Result In A Significant Amount Of Tree Mortality

Finally, Plaintiff claims that the alternatives analysis is flawed because the only action considered is inconsistent with the underlying management objective for the Smokey Project, which is to assure that tree mortality not exceed a maximum of 25 percent. Opp'n at 12 (citing Environmental Assessment at 4). Again, this challenge goes beyond the scope of the Court's order, which required the USFS to consider the diameter caps suggested during the scoping process. Further, Plaintiff did not raise this issue in its original Motion for Summary Judgment. See MSJ, ECF No. 103. Plaintiff is attempting to use this opportunity to litigate new issues.

Even were the Court to countenance this argument, it lacks merit. The USFS explains that the 25 percent mortality rate discussed in the Late Successional Reserve Assessment ("LSRA") refers to potential mortality from future wildfire, not mortality due to fuel treatment removal. See Opp'n at 12; Obj. Resp. at 10. Plaintiff describes this explanation as absurd, but it is consistent with the quoted portion of the LSRA. See AR 5298-99 (LSRA at 35). The quoted rate is included in a sub-section titled "Risk to LSR Habitat From Future Large-Scale Disturbances," which discusses the potential risk that wildfires pose to LSR habitat. AR 5295-96 (LSRA at 31-32). The entire section discusses predicted mortality rates for different areas of the forest and habitat classes should fires occur. The following portion of this section, which is quoted in the Smokey Project Environmental Assessment, does appear to refer to

mortality caused by fires and not by fuel reduction treatments: "Fuel management strategies and techniques that reduce the intensity of wildfires, limit flame lengths to less than four feet, and reduce the likelihood of crown fires would reduce tree mortality to less than 25% and maintain late successional habitat." AR 5299 (LSRA at 35). The USFS is entitled to deference in interpreting its own regulations unless that interpretation is plainly inconsistent with the regulation at issue. <u>Native Ecosystems Council v. U.S. Forest Service</u>, 418 F.3d 953, 960 (9th Cir. 2005). Such deference is warranted here. Plaintiff has also not identified any USFS document or rule that restricts overall tree mortality to 25 percent. For all these reasons, Plaintiff's argument fails.

> **D.    Past Monitoring**
>
> > 1.    <u>Prior Ruling</u>

In its merits order, the Court expressed concern that the USFS admitted it had not completed the monitoring for other projects in the Mendocino National Forest as required in the Enforceable Terms and Conditions found in prior Biological Opinions. SJ Order at 19-20. Though the Court did not find that this issue rendered the decision not to complete an EIS arbitrary and capricious, it found the lack of explanation for this deficiency meant the agency failed to take a "hard look" at the impacts of the Smokey Project. <u>Id.</u> at 40-41.

> > 2.    <u>Supplemental Analysis</u>

The USFS claims that the Mendocino National Forest was and is in full compliance with its ESA monitoring obligation. SEA at 16. It clarified that the monitoring for several projects had

1  not been done because the projects had either been cancelled or
2  not yet been implemented.  Id.  Only one project—of the 15
3  projects that have gone through formal consultation for the NSO—
4  has been implemented and requires annual reporting: the Westshore
5  project.  The USFS has done the necessary monitoring for the
6  Westshore project and the information gathered does not affect
7  the Smokey Project's expected impacts or significantly modify the
8  environmental baseline.  Id. at 16–19.

9              3.  Plaintiff's Objections

10      Plaintiff does not dispute the fact that the USFS has
11  complied with the monitoring requirements imposed following
12  formal consultation with the FWS.  Instead they argue:

        Conservation Congress has demonstrated that the USFS
13      has monitoring obligations arising from other sources.
        For example, Conservation Congress has explained that
14      the USFS has mandatory monitoring obligations imposed
        by the USFS's Mendocino National Forest Land and
15      Resource Management Plan and the USFWS's "2011
        Northern Spotted Owl Survey Protocol," and that the
16      USFS has failed to comply with these monitoring
        obligations.
17

18  Opp'n at 13.  Plaintiff cites back to declarations it submitted
19  in the remedy briefing indicating that the USFS has failed to
20  comply with such requirements.

21      In the summary judgment briefing, Plaintiff took issue with
22  the general lack of monitoring and the USFS's failure to perform
23  the monitoring required by FWS following formal consultation on
24  previous projects.  See generally MSJ, ECF No. 103; Reply, ECF
25  No. 114.  The Court only found a violation due to the fact that
26  the USFS failed to account for its admitted failure to do
27  monitoring required in other Biological Opinions.  The SEA
28  addresses the Court's concern.  Plaintiff has not provided any

                              18

reason for the Court to question the USFS's representations

concerning its monitoring of other projects.  It has not argued

that there is any project the USFS failed to account for in the

SEA or that any of the information is inaccurate.  The Court

therefore finds that the USFS has cured the identified monitoring

deficiencies.

The challenges Plaintiff raises also exceed the scope of the

Court's order.  During the remedy briefing stage, Plaintiff

attempted to introduce declarations and evidence showing that the

USFS has failed to comply with the Survey Protocols and the

monitoring required for the Smokey Project.  Plaintiff again

refers the Court to this evidence as well as evidence concerning

surveys in the year 2017.  Opp'n at 16 (citing Sugarman Decl.,

Ex. 2).  But Plaintiff has not provided a legal basis for the

Court to consider such evidence at this stage of the proceedings.

It is a new argument; Plaintiff contends that because the USFS

has failed to perform protocol-level surveys in the Smokey

Project area, the Court should find that the agency failed to

take a "hard look" at the Project's impacts.  The new argument

has little to do with the Court's prior order and seeks to

litigate new violations.

Plaintiff also argues that the USFS knows about a nesting

pair of northern spotted owls in a stand occupying stands

adjacent to commercial timber units.  Opp'n at 14.  Plaintiff

raised this issue in its Supplemental Claim against the FWS and

the Court deferred to the agencies' interpretation of the

available data.  SJ Order at 48.  This issue may not be revisited

here.

The USFS argues that Plaintiff should not be allowed to pursue its new claims regarding insufficient monitoring due to the doctrine of primary jurisdiction.  The doctrine is a prudential one under which courts may, under appropriate circumstances, determine that the initial decision making responsibility should be performed by the agency rather than the courts.  Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc., 307 F.3d 775, 780 (9th Cir. 2002).  "Primary jurisdiction is properly invoked when a claim is cognizable in federal court but requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency."  Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1172 (9th Cir. 2002).  The USFS asks the Court to exercise its discretion to defer the monitoring claim, to the extent it relies on new 2017 survey data, to the agency.

The Court finds the USFS cured the monitoring issue the Court identified in the SJ Order.  Plaintiff has not contested the agency's account of its activities for other projects, but instead, has improperly raised issues outside the scope of the Court's Order.  Because the USFS has satisfied its obligation on this issue, the Court need not decide the USFS' primary jurisdiction contention to resolve this issue.

**E.   LOPs**

    1.   Prior Ruling

In the Merits Order, the Court found that the Limited Operation Period protocol was stated inconsistently throughout the record, making it difficult (if not impossible) for one to know how the LOPs operate and determine agency compliance.  SJ

Order at 41.  The confusion principally stemmed from statements

in the Environmental Assessment and Appendix A, stating that "A

limited operating period for northern spotted owls would be

applied to all units from February 1 to September 15 unless

current protocol-level surveys indicate that they are

unnecessary."  SJ Order at 39 (emphasis added).  This statement

did not accord with the LOPs stated in the Biological Assessment

and the three Biological Opinions.

2.  Supplemental Analysis

The USFS thoroughly discusses and describes the LOPs in the

Supplemental Environmental Assessment and in Appendix 3 – Unit-

Specific LOP Application and History.  It clarifies that "any

characterization of the LOPs in the EA that differs from the LOP

general requirements in the 2011 BA and 2012 BO . . . should be

disregarded."  App. 3 at 1 (Section 2.1 Application Error in the

EA).  The Appendix explains the LOPs and provides a chart showing

(and explaining the basis for) the applicable LOP for every unit

in the Smokey Project for the year 2017.  Id. at 4-12.

3.  Plaintiff's Objections

Plaintiff argues that the supplemental analysis did not cure

the deficiencies.  It argues that the Environmental Assessment

plainly stated that "an LOP for northern spotted owls would be

applied to all units from February 1 to September 15 unless

current protocol-level surveys indicate that they are

unnecessary."  Opp'n at 17.  Now, it takes issue with the

supplemental documents' characterization of that statement as an

"application error."

Plaintiff's argument fails to account for the fact that the

21

USFS could not comply with this Court's order without providing
an explanation for the inconsistent statements in the decision
record.  The USFS solved the problem by retracting the overbroad
and confusing statements and supplementing the record with a
thorough explanation that takes precedence over the earlier
statements.  <u>See</u> SEA at 4 (explaining that where there is
conflict with earlier documents "this supplemental document shall
take precedence over the 2012 EA.").

Plaintiff has not identified any other issues with the
supplemental explanation of the LOPs.  Plaintiff has also not
disputed any of the information in the LOP chart in Appendix 3.
For all these reasons, the Court rejects Plaintiff's argument.

## IV.   CONCLUSION

The USFS adequately addressed each of the Court's concerns.
While the result did not change, the agency provided a reasoned,
clear, and thorough analysis for its conclusions.  The purposes
of NEPA, ensuring process but not outcomes, have been met through
these supplemental efforts.  For all the foregoing reasons, the
Court grants the Federal Defendants' and Intervenor's Motion to
Dissolve the Injunction.

IT IS SO ORDERED.

Dated: March 2, 2018.

_____
JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE